EXHIBIT 1

AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

**EASTERN** DISTRICT OF **VIRGINIA**

DEC 1 5 2004

CLERK U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNITED STATES OF AMERICA

v.

**CRIMINAL COMPLAINT**

AMERICA ONLINE, INC
22000 AOL Way
Dulles, Virginia 20166

CASE NUMBER: 1:04 M 1133

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. In or about <u>September 2000 and continuing until in or about June 2001,</u> in <u>Loudoun</u> County, in the <u>Eastern</u> District of <u>Virginia</u> defendant(s) did, (Track Statutory Language of Offense)

knowingly, intentionally and unlawfully aid and abet a violation of the Federal Securities laws, in violation of Title 18, United States Code, Section 2; Title 15, United States Code, Sections 78j and 78ff(a); and Title 17, Code of Federal Regulations, Section 240.10b-5.

I further state that I am a(n)  **Special Agent of the FBI**   and that this complaint is based on the following facts:
Official Title

    See Attached Affidavit

Continued on the attached sheet and made a part hereof:    ☒ Yes    ☐ No

**AUSA- Charles F. Connolly**

Sworn to before me and subscribed in my presence,

Signature of Complainant
**Robert Core**
**Special Agent**
**FBI**

<u>December 15, 2004</u>                    at      <u>Alexandria, Virginia</u>
Date    BARRY R. PORETZ                              City and State
     UNITED STATES MAGISTRATE JUDGE

Name & Title of Judicial Officer Virginia                    Signature of Judicial Officer

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

UNITED STATES OF AMERICA      )
     )
         v.          )      CRIMINAL NO. 1:04 M 1133
     )
AMERICA ONLINE, INC.,      )
     )
         Defendant.      )

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Robert T. Core, being duly sworn, deposes and states as follows:

1.     I am a Special Agent of the Federal Bureau of Investigation, assigned to the Northern Virginia Resident Agency of the Washington Field Office. I have been employed as a Special Agent for more than twenty-five years and have been a licensed attorney for more than twenty-six years. I have been charged with investigating criminal white collar offenses involving fraud exclusively since 1989. I have been assigned to the investigation of the instant matter since July 26, 2002.

2.     Attached hereto and incorporated herein as Appendix A is a Statement of Facts, setting forth information obtained in the course of investigation through interviews of individuals, examination of documentary records, and examination of financial records. The facts and information contained in the Statement of Facts are based upon my personal knowledge, as well as the observations of other agents and officers involved in this investigation.

3.     The Statement of Facts contains information necessary to support probable cause for a criminal complaint. It is not intended to include each and every fact and matter observed by me or known to the government.

4.     Based on the facts contained in the Statement of Facts, I respectfully submit that there is probable cause to believe that AOL, acting through its officers and employees, did commit, in the Eastern District of Virginia and elsewhere, a violation of federal law, that is, aiding and abetting a violation of federal securities laws, Title 18, United States Code, Section 2; Title 15 United States Code, sections 78j(b) and 78ff; and Title 17, Code of Federal Regulations, Section 240.10b-5.

The above information is true and correct to the best of my knowledge, information and belief.

Robert T. Core, Special Agent,
Federal Bureau of Investigation

SUBSCRIBED AND SWORN TO
BEFORE ME IN MY PRESENCE
THIS WEDNESDAY, DECEMBER 15, 2004

United States Magistrate Judge
Eastern District of Virginia

2

APPENDIX A

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 1:04 M 1133 |
| | ) | |
| AMERICA ONLINE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

STATEMENT OF FACTS

**A.    AOL and Time Warner**

    1.      Prior to on or about January 11, 2001, America Online, Inc. (hereinafter "AOL"), was a publicly-owned corporation organized and existing under the laws of the State of Delaware and based in Dulles, Virginia in the Eastern District of Virginia. AOL was a leader in interactive services, web brands, Internet technologies, and electronic commerce services, and engaged in the sale of, among other things, Internet subscriptions and advertising.

    2.      On or about September 13, 2000, AOL launched its Netscape NetBusiness platform, which was designed to be an Internet site dedicated to providing interactive services to the small business community.

    3.      On or about January 11, 2001, AOL and Time Warner Inc. consummated a merger. Following the merger, AOL operated as a separate division and wholly-owned subsidiary of the combined company, which was named AOL Time Warner Inc.

    4.      On or about October 16, 2003, AOL Time Warner Inc. changed its name to Time

1

Warner Inc. (hereinafter "TWI"). TWI is a publicly-owned corporation organized and existing under the laws of the State of Delaware and based in New York, New York. Among other things, TWI engages in the sale of broadcast and print media products.

5.     Prior to on or about January 11, 2001, the common stock of TWI and AOL was publicly traded on the New York Stock Exchange. After the merger, the common stock of TWI continued to be publicly traded on the New York Stock Exchange, and was bought and sold by individuals and entities throughout the United States, including the Eastern District of Virginia.

6.     AOL's Business Affairs and Interactive Marketing groups were primarily responsible for negotiating contracts, advertising deals and marketing arrangements with customers.

**B.     PurchasePro.com**

7.     PurchasePro.com, Inc. ("PurchasePro") was a publicly-owned corporation duly organized and existing under the laws of the State of Nevada and based in Las Vegas, Nevada. The common stock of PurchasePro was publicly traded on the National Market of the National Association of Securities Dealers Automated Quotations System ("NASDAQ"). PurchasePro's common stock was bought and sold by individuals and entities throughout the United States including the Eastern District of Virginia. Among other things, PurchasePro engaged in the sale of Internet procurement software and services.

8.     By the third quarter of 2000 and continuing through 2001, PurchasePro's principal product was a form of Internet software known as a "marketplace license" used for business-to-business or "B2B" commerce. As promoted by PurchasePro, the marketplace license allowed small and large businesses to buy and sell products on the Internet in a cost-

efficient manner.

9.      In addition to its marketplace licenses, PurchasePro also sold re-seller marketplace licenses, preferred supplier agreements, hosting and maintenance services and "bulk" subscriptions.

**C.      Securities Regulation**

10.     The Securities and Exchange Commission ("SEC") was an agency of the United States responsible for the review of financial statements and reports of the issuers of securities. The SEC relies on the accuracy and truthfulness of the reports filed with it.

11.     As publicly-traded companies, TWI, AOL and PurchasePro and their directors, officers and employees were required to comply with the federal securities laws and regulations. Those laws and regulations were designed to ensure that the financial information of publicly-traded companies was accurately recorded and disclosed to the investing public.

12.     Under the federal securities laws and regulations, TWI, AOL and PurchasePro were required, among other things: (a) to make and keep books, records and accounts that accurately and fairly reflected the business transactions of the respective companies; (b) to file with the SEC quarterly reports (known as a SEC Form 10-Q), annual reports (known as a SEC Form 10-K) and other periodic reports that included accurate and reliable financial statements prepared in accordance with Generally Accepted Accounting Principals ("GAAP").

13.     TWI, AOL and PurchasePro were required to retain outside public auditors to review, audit and test their respective financial statements for compliance with appropriate accounting rules.

3

D.    The AOL-PurchasePro Strategic Partnership

14.    On or about March 15, 2000, PurchasePro and AOL entered into a series of contractual agreements, including the Interactive Marketing Agreement ("IMA"), the Technology Development Agreement ("TDA") and the Warrant Agreement. The IMA obligated PurchasePro to pay AOL $50 million in cash; $25 million upon signing and $3.57 million each quarter for seven consecutive quarters ending December 2001. The TDA obligated PurchasePro to pay AOL a total of $20 million in increments of $2.5 million per quarter beginning in or about August 2000. These payments were intended to reimburse AOL for the development costs associated with building AOL's internet platform. The Warrant Agreement provided AOL with 500,000 PurchasePro warrants and allowed AOL to earn up to 1,500,000 performance warrants based upon certain criteria and PurchasePro revenue thresholds.

15.    The agreements were intended to create a strategic partnership between AOL and PurchasePro in which the companies would co-develop a business-to-business global marketplace on AOL's Netscape NetBusiness service.

16.    As of the close of the third quarter of 2000, PurchasePro had not met any of the revenue thresholds established by the Warrant Agreement and AOL had not earned any performance warrants.

17.    On or about December 29, 2000, AOL and PurchasePro amended the Warrant Agreement to modify the criteria and revenue thresholds necessary for AOL to earn the performance warrants. The parties made the Amendment effective as of November 18, 2000. The amended Warrant Agreement also accounted for the intervening 2-for-1 split of PurchasePro's common stock. Therefore, AOL could earn up to 3 million performance warrants.

4

The value of the warrants that AOL could earn was capped at $30 million for the fourth quarter of 2000, $45 million for the first quarter of 2001 and $60 million for the second quarter of 2001. The value was to be determined by an agreed-upon formula that allowed AOL to earn warrants with a value of $3 for each dollar of revenue PurchasePro recognized as a result of a third party revenue referred to PurchasePro by AOL. In short, AOL earned $3 in warrants for each $1 of revenue it referred to PurchasePro.

**E.      AOL Officers and Employees Aided and Abetted PurchasePro's Fraud**

18.      From in or about September 2000 to in or about June 2001, in the Eastern District of Virginia and elsewhere, six or more AOL officers and employees, in exchange for increased revenue to AOL in the fourth quarter of 2000 and the first quarter of 2001, aided and abetted PurchasePro officers' false and fraudulent inflation of PurchasePro's revenues as reported to the investing public in the fourth quarter of 2000 and the first quarter of 2001.

**Third Quarter of 2000**

19.      In or about September 2000, a Business Affairs employee agreed on behalf of AOL to purchase ten re-seller marketplace licenses from PurchasePro for a total cost of $2 million in an effort to help PurchasePro exceed analyst estimates for third quarter 2000 revenue and in exchange for PurchasePro's agreement to amend the Warrant Agreement. AOL purchased these re-seller marketplace licenses without having a need for them and without any intention of using the licenses.

20.      On or about October 11, 2000, the same Business Affairs employee, on behalf of AOL, falsely confirmed in writing to PurchasePro's outside auditors that there were "no other contracts or agreements as to terms, whether written or oral, between PurchasePro and AOL that

5

relate" to the purchase of $2 million re-seller marketplace licenses when in fact the employee knew that the re-seller licenses were bought in exchange for the promise to amend the warrant agreement in the future.

**Fourth Quarter of 2000**

21.     In or about December 2000, at least two Business Affairs employees agreed on behalf of AOL to purchase approximately $10 million of products from PurchasePro in exchange for PurchasePro's agreement to grant AOL $30 million worth of PurchasePro warrants. To fulfill this agreement, on or about December 21, 2000, AOL entered into a Bulk Subscription Sales Agreement that required AOL to purchase from PurchasePro approximately 100,000 Promotional Subscriptions at $49 each for a total of $4.9 million. AOL also purchased 5 marketplace licenses for a total of approximately $4.6 million.

22.     On or about December 21, 2000, PurchasePro senior officers, with the assistance and knowledge of AOL officers and employees, sent a letter to AOL indicating that PurchasePro had earned over $10 million in recognizable revenue in the fourth quarter of 2000 and therefore that AOL had earned warrants valued at $30 million.

23.     AOL officers and employees learned, however, that PurchasePro's outside auditors would require PurchasePro to net any revenue received directly from AOL against the $30 million in warrants. Simply put, AOL officers and employees learned that the exchange of approximately $10 million in direct purchases for the $30 million in warrants would result in no recognizable revenue for PurchasePro. Therefore, AOL officers and employees assisted PurchasePro officers in concealing the true nature of the agreement from PurchasePro's outside auditors, by doing the following:

6

a.      In or about the fourth quarter of 2000, a Business Affairs employee and an Interactive Marketing employee, on behalf of AOL, signed referral forms falsely indicating that AOL had referred a number of companies that purchased marketplace licenses from PurchasePro in the fourth quarter 2000;

b.      On or about February 7, 2001, a Business Affairs employee caused another Business Affairs employee to execute a letter that purported to "clarify ambiguities" in the Amended Warrant Agreement by stating that AOL could not earn warrants as a result of revenue resulting from products sold directly from PurchasePro to AOL; and

c.      On or about February 8, 2001 a Business Affairs employee signed a letter to PurchasePro's auditors that falsely stated that there were no additional written or oral agreements relating to the revenues resulting from AOL's purchase of marketplace licenses for approximately $4.6 million in the fourth quarter of 2000, when in fact that employee knew that the $4.6 million purchase was part of the exchange for the $30 million in warrants.

24.      On April 2, 2001, PurchasePro filed its annual report on Form 10-K for fiscal year ending December 31, 2000, falsely reporting annual revenues of approximately $65 million and revenues for the fourth quarter of 2000 of approximately $33.59 million. The Form 10-K also falsely stated that AOL referred $10.5 million of revenue to PurchasePro. The Form 10-K was filed electronically with the EDGAR Management Office of Information and Technology in Alexandria, Virginia in the Eastern District of Virginia.

**First Quarter of 2001**

25.    In the first quarter of 2001, two Business Affairs employees and an Interactive Marketing employee agreed to assist PurchasePro in selling marketplace licenses to AOL's customers and partners through the use of undocumented guarantees, oral promises, or other propositions designed to ensure that the purchaser would not suffer any net financial loss as a result of the marketplace license purchase.  AOL officers and employees agreed to reach secret side agreements with license purchasers or commit to "sweeteners" that included, among other things: (i) promises to reduce by a specified dollar value future payments the marketplace license purchasers already were contractually obligated to pay AOL; (ii) promises to provide a specified dollar value worth of on-line advertisements or carriage on AOL's Internet properties; (iii) promises by AOL to buy more products from its suppliers; (iv) promises by AOL to buy its products from suppliers at a higher price; or (v) combinations of two or more such promises.

26.    AOL had an economic incentive to help sell PurchasePro marketplace licenses in the first quarter of 2001 because PurchasePro promised to give AOL, among other things: (i) a 50% commission for each marketplace license that AOL sold on PurchasePro's behalf; and (ii) $3.00 worth of PurchasePro warrants under the amended Warrant Agreement for each $1.00 of referred revenue recognized by PurchasePro in the first quarter of 2001.

27.    During the final weeks of the first quarter of 2001, AOL employees made oral promises to numerous customers or partners in order to induce the customer's or partner's purchases of marketplace licenses.  These undocumented promises and agreements resulted in at least nine marketplace license sales by PurchasePro in the first quarter of 2001 for a total of approximately $8.1 million.

8

28.     During the final weeks of the first quarter of 2001 and continuing after the close of the first quarter into April 2001, two Business Affairs employees pursued ways to further assist PurchasePro with its quarterly revenue numbers and eventually agreed to an Amendment to the Bulk Subscriptions Agreement.  Pursuant to the Amendment, AOL agreed to once again purchase bulk subscriptions from PurchasePro for AOL's Netbusiness customers.  At or about the close of the first quarter of 2001, these employees agreed on behalf of AOL to purchase subscriptions covering January, February and March 2001 for a total of approximately $9 million.  AOL's NetBusiness users, however, were not made aware of these free subscriptions to the PurchasePro marketplace until late March 2001.

29.     In or about the last days of March 2001, a Business Affairs employee agreed to further assist PurchasePro's efforts to meet its first quarter revenue estimates by agreeing that AOL would pay PurchasePro approximately $3.65 million for integration work allegedly performed by PurchasePro in the first quarter of 2001.  On or about Saturday, March 31, 2001, a NetBusiness employee assisted PurchasePro employees in this endeavor by providing PurchasePro with language for the contract, called a Statement of Work, formalizing this agreement.  AOL employees knew that the work necessary to support AOL's payment of approximately $3.65 million to PurchasePro had not been completed in the first quarter of 2001.  Indeed, AOL employees were aware that PurchasePro employees were still drafting the Statement of Work, which defined the work necessary for the integration and the $3.65 million payment, during the first week of April 2001.

30.     Nevertheless, a NetBusiness employee falsely confirmed to PurchasePro's outside auditors that the work had been completed.  Subsequently, a second NetBusiness employee

9

signed a confirmation letter on behalf of AOL for PurchasePro's outside auditors that falsely stated, among other things, "all work covered under the Statement of Work dated February 5, 2001 was completed and accepted as of March 30, 2001."

31.    On or about April 24, 2001, a NetBusiness employee participated in a telephone conference call with one of PurchasePro's outside auditors and again falsely confirmed that the integration work under the Statement of Work had been completed by March 31, 2001.

32.    At the close of the first quarter of 2001, PurchasePro issued warrants to AOL under the amended Warrant Agreement that were valued at approximately $7.7 million. This warrant revenue, which was recognized by AOL, was based entirely on the sale of one marketplace license for $3.7 million to a customer allegedly referred to PurchasePro by AOL. In fact, AOL did not refer the customer. Nevertheless, a Vice President in Interactive Marketing signed, on behalf of AOL, a referral form falsely representing that AOL had referred the purchaser.

33.    On or about March 31, 2001, two Business Affairs employees and an Interactive Marketing employee demanded that PurchasePro pay AOL $12.2 million as payment for commissions allegedly earned by AOL from its first quarter 2001 marketplace license sales campaign. In fact, the two Business Affairs employees and the Interactive Marketing employee knew that AOL had not earned the full $12.2 million in commissions but had earned only about $6.7 million in commissions, and much of that was from undocumented and undisclosed side deals. But the AOL officers and employees knew that in order to recognize all $12.2 million in commission revenue in the first quarter of 2001, the check had to be received by midnight on March 31, 2001. Therefore, a senior executive at PurchasePro personally delivered to AOL a

10

hand written check for $12.2 million.

34.     As of the close of the first quarter of 2001, PurchasePro was well short of meeting its revenue estimates.  Knowing that PurchasePro's officers were "keeping the quarter open" in an effort to close the gap, and in order to "earn" the $12.2 million in first quarter commissions for which AOL had already been paid, at least two Business Affairs employees agreed to continue to sell PurchasePro marketplace licenses to AOL customers and partners.  To disguise the efforts to sell marketplace licenses after the close of the quarter, an AOL employee facilitated the back-dating of the contracts to make it appear that the contracts were signed by the close of the first quarter of 2001.  These efforts resulted in at least two additional marketplace license sales with a total value of approximately $6.7 million being back-dated into the first quarter of 2001.

35.     On or about April 5, 2001, at least two Business Affairs employees and a Senior Vice President within Business Affairs, on behalf of AOL, executed or caused to be executed the Amended Bulk Subscription Agreement dated "as of March 31, 2001" that required AOL to pay PurchasePro a total of approximately $9 million for bulk subscriptions in January, February and March 2001.

36.     On or about April 18, 2001, a NetBusiness employee wrote an e-mail to another AOL employee discussing the efforts to justify the $9 million Amended Bulk Subscriptions Agreement.  The e-mail stated in part:  "This is the scoop.  During the week of 4/5 [two Business Affairs employees] had to make [PurchasePro senior executive] whole to help him make his numbers.  [$]9M[illion] in subscriptions was something [AOL employees] put together because we couldn't sell enough marketplaces despite best efforts."

11

37.    On April 26, 2001, PurchasePro publicly announced that it had earned approximately $29.8 million in revenue for the quarter ended March 31, 2001.

38.    On May 29, 2001, PurchasePro filed its quarterly report on Form 10-Q for the quarterly period ending March 31, 2001, reporting quarterly revenues totaling approximately $16.02 million.  The Form 10-Q was filed electronically with the EDGAR Management Office of Information and Technology in Alexandria, Virginia in the Eastern District of Virginia.

**F.     Conclusion**

39.    As a result of the actions of its officers and employees, AOL aided and abetted PurchasePro's officers in reporting at least $10 million -- or approximately 1/3 of the quarterly revenue included in the From 10-K -- in false revenue in the fourth quarter of 2000 and at least $20 million -- or nearly 2/3 of the total revenue publicly announced on April 26, 2001 -- in false revenue in the first quarter of 2001.

40.    As a result of aiding and abetting PurchasePro's officers' fraud, AOL was able to report approximately $20 million of additional revenue from PurchasePro in the Fourth Quarter of 2000 and approximately $15 million of additional revenue in the first quarter of 2001.

41.    AOL acknowledges that venue is proper in the Eastern District of Virginia and waives any objection to venue in the Eastern District of Virginia as well as any objection to this Court's exercising jurisdiction in this matter.


There are other matters and facts known to the parties that are not included in this Statement of Facts.

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

DEC 1 5 2004

UNITED STATES OF AMERICA                )
                                        )
                v.                      )    CRIMINAL NO. 1:04 M 1133
                                        )
AMERICA ONLINE, INC.,                   )
                                        )
                Defendant.              )

**JOINT MOTION OF THE PARTIES TO HOLD THE
CRIMINAL COMPLAINT IN ABEYANCE FOR TWENTY FIVE MONTHS**

COMES NOW, the United States of America, through its attorneys, Paul J. McNulty,

United States Attorney, Dana J. Boente and Charles F. Connolly, Assistant United States

Attorneys, and Adam A. Reeves, Trial Attorney, Criminal Division, United States Department of

Justice, and America Online, Inc. ("AOL"), through its attorney Richard Cullen, and hereby

jointly move the Court for an Order holding in abeyance for twenty five months the criminal

complaint against AOL filed concurrently with this Joint Motion. Pursuant to the Deferred

Prosecution Agreement between the United States and AOL filed concurrently herewith, a

criminal complaint has been filed against AOL for aiding and abetting a violation of the federal

securities laws in violation of Title 18, United States Code, Section 2, Title 15, United States

Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

Under the Deferred Prosecution Agreement, the government agreed to defer prosecution on the

criminal complaint for twenty four months and will dismiss the complaint within 30 days of the

expiration of twenty fourth month if AOL fully complies with its obligations as set forth in the

Deferred Prosecution Agreement.

1

# Exhibit 2

AOL consents to the foregoing and expressly waives any and all rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161(h)(2), or other pertinent provisions and consents to the adjournment of all proceedings in this case.

WHEREFORE, the parties hereby move the Court for an Order holding the criminal complaint in abeyance for twenty five months.

Dated: December 15, 2004                     Respectfully submitted,

                                              PAUL J. MCNULTY
                                              UNITED STATES ATTORNEY

                              By:    _____
                                     Dana J. Boente
                                     Charles F. Connolly
                                     Assistant United States Attorneys

                              By:    _____
                                     Adam A. Reeves
                                     Trial Attorney, Criminal Division
                                     United States Department of Justice


                              On behalf of America Online, Inc.

                                     _____
                                     Richard Cullen, Esq.
                                     McGuireWoods LLP
                                     Counsel to America Online, Inc.

<u>CERTIFICATE OF SERVICE</u>

      I certify that a true and correct copy of the foregoing Joint Motion of the Parties to Hold the Criminal Complaint in Abeyance for Twenty Five Months was sent by first class mail and facsimile on the 15th day of December 2004 to:

Richard Cullen, Esq.
McGuireWoods LLP
One James Center
901 East Canary Street
Richmond, VA 23219
phone:  804-775-1000
facsimile: 804-698-2035

Counsel to Time Warner Inc.

_Charles F. Connolly_
Charles F. Connolly

3

EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL NO. 1:04 M 1133 |
| v. | ) | |
| | ) | VIOLATION: |
| AMERICA ONLINE, INC, | ) | 18 U.S.C. § 2 |
| | ) | (Aiding & Abetting) |
| Defendant. | ) | 15 U.S.C. §§ 78j(b); 78ff; Title 17 C.F.R. Section |
| | ) | 240.10b-5 (Securities Fraud) |

## DEFERRED PROSECUTION AGREEMENT

America Online, Inc. (hereinafter "AOL"), a wholly-owned subsidiary of Time Warner Inc., by its undersigned attorneys and its Chief Executive Officer, pursuant to authority granted by its board of directors, and the United States Attorney's Office for the Eastern District of Virginia ("EDVA") and the United States Department of Justice, Criminal Division (collectively the "Department of Justice"), enter into this Deferred Prosecution Agreement ("Agreement").

1.     AOL understands that the United States will file a criminal complaint in the United States District Court for the Eastern District of Virginia charging AOL with aiding and abetting securities fraud, in violation of Title 18, United States Code, Section 2, Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

2.     During the Department of Justice's ongoing criminal investigation into various business transactions between AOL and numerous AOL partners, the Department of Justice has notified AOL that, in the judgment of the Department of Justice, AOL, acting through certain officers and employees, has violated federal criminal law in 2000, 2001 and 2002 in connection with transactions between AOL and PurchasePro.com ("PPRO") (hereafter "PPRO Transactions"). Aspects of the PPRO Transactions are described in more detail in the Statement of Facts attached hereto as Appendix A and incorporated by reference herein.

3.     AOL accepts and acknowledges responsibility for the conduct of AOL personnel giving rise to violations of criminal law in connection with the PPRO Transactions by entering into this Agreement and by, among other things, the remedial actions it has taken to date, its continued commitment to full cooperation with the Department of Justice, its agreement to establish a compensation and settlement fund and to pay a monetary penalty. AOL agrees not to contest or contradict the factual statements set forth in Appendix A, as more fully addressed in paragraph 12. AOL does not endorse, ratify, or condone improper conduct and, as set forth below, has taken steps to prevent such conduct from occurring in the future.

# Exhibit 3

4.    Based upon AOL's acceptance of responsibility; its adoption of internal compliance measures, set forth in Appendix B; its cooperation with the Independent Monitor described in paragraph 13; its agreement with the Department of Justice to pay into a compensation and settlement fund $150,000,000.00, which includes $30,000,000.00 for the PPRO Transactions, as described in more detail in paragraph 9 below; its agreement with the Department of Justice to pay a monetary penalty of $60,000,000.00, as described in paragraph 10 below; and its willingness to continue to cooperate with the Department of Justice in its investigation of the matters described herein; the Department of Justice, on the understandings specified below, agrees:

    a.   To recommend to the Court that prosecution of AOL on the criminal complaint filed pursuant to paragraph 1 be deferred for a period of 24 months;

    b.   Not to prosecute AOL for any other conduct relating to the PPRO Transactions, including any accounting, statements, disclosures, or omissions related to the PPRO Transactions; and

    c.   Not to prosecute AOL for conduct committed by AOL relating to the transactions set forth in the list of covered transactions attached as Appendix C and incorporated herein ("Covered Transactions"). This also includes any accounting, statements, disclosures, or omissions related to the Covered Transactions, from July 1, 1999 through the date of this Agreement. This section does not confer immunity for violations of antitrust, bribery or tax statutes, rules or regulations.

Should the Court decline to approve the Agreement to defer prosecution for any reason, this Agreement shall be null and void, and the parties shall revert to their pre-agreement positions.

AOL understands and agrees that if it commits a material, willful and knowing breach of this Agreement, as provided in paragraph 17 below, the Department of Justice can prosecute AOL for conduct committed by it through its officers and employees relating to the PPRO Transactions or any of the Covered Transactions. This Agreement does not provide any protection to any individual or any entity other than AOL. This paragraph 4 shall survive termination of this Agreement.

5.    During the term of this Agreement, AOL agrees to cooperate completely with the Department of Justice, the Independent Monitor described in paragraph 13 below, and, as directed by the EDVA or the Criminal Division, with any other federal criminal law enforcement agency regarding any matters related to the PPRO Transactions or the Covered Transactions. AOL shall truthfully disclose to the Department of Justice information within AOL's possession, custody or control with respect to the PPRO Transactions and the Covered Transactions about which the Department of Justice shall inquire, and shall continue to cooperate fully with the Department of Justice. This obligation of truthful disclosure includes an obligation to provide the Department of Justice access to AOL's documents and employees, whether or not located in the United States, and reasonable access to AOL's facilities for that purpose. The disclosure obligations set forth in this Agreement are subject to paragraphs 6, 7 and 8 of this Agreement.

6.    AOL agrees that with respect to both the PPRO Transactions and the Covered Transactions, its cooperation shall include, but is not limited to, the following, subject to paragraph 8:

    a.  Completely and truthfully disclosing information within AOL's possession, custody or control with respect to the activities of AOL, its affiliates and its present and former officers, agents, and employees, concerning the subject matters inquired into by the Department of Justice as requested by the Department of Justice;

    b.  Assembling, organizing and providing on request from the Department of Justice documents, records, or other tangible evidence related to the subject matters in AOL's possession, custody, or control in such format as the Department of Justice reasonably requests. Where appropriate, AOL will continue to use the services of expert technical consultants to assist in the identification and retrieval of relevant data.

    c.  Using its reasonable best efforts to make available its present or former officers, directors and employees, whether or not located in the United States, to provide information and/or testimony related to the subject matters as requested by the Department of Justice, including sworn testimony before a federal grand jury or in federal trials, as well as interviews with federal law enforcement authorities. Cooperation under this paragraph will include identification of witnesses who, to AOL's knowledge, may have material information regarding the subject matters.

    d.  Providing testimony and other information deemed necessary by the Department of Justice or a court to identify or establish the original location, authenticity, or other evidentiary foundation necessary to admit into evidence documents in any criminal or other proceeding as requested by the Department of Justice related to the subject matters.

7.    AOL further agrees to the following:

    a.  During the term of this Agreement, AOL will make available to the Department of Justice copies of (i) the portions of any Time Warner Internal Audit Monthly Activity Report, and the portions of any Time Warner Compliance Committee Log, that concern any Covered Transaction; (ii) any letter threatening litigation that is received by AOL, or any civil complaint that is filed and served on AOL, from a counterparty to any Covered Transaction concerning the Covered Transaction; and (iii) any documents and privilege log entries, not previously produced to the government, that are produced in the civil shareholder cases concerning any Covered Transaction. The obligation to make information available to the Department of Justice under this sub-paragraph shall not require the disclosure of any information protected by the attorney-client or work product privileges, but is subject to

paragraph 8. Although AOL may voluntarily choose to investigate further, no further investigation shall be required as a condition of this Agreement.

b. Concurrent with the signing of this Agreement, AOL will adopt a new internal standard of conduct under which it will inform the Department of Justice of any new matter reported to Time Warner's Audit and Finance Committee that involves substantial and credible evidence of any Federal Crimes as defined in paragraph 17 of this Agreement. The obligation to inform the Department of Justice under this new standard of conduct shall be subject to the following limits: (i) it shall apply only to matters involving conduct committed at AOL after the date of this Agreement; (ii) it shall apply only to matters that are in fact reported to Time Warner's Audit and Finance Committee, and although AOL may voluntarily choose to investigate further, no investigation shall be required as a condition of this Agreement; (iii) it shall require reasonably timely notification of the Department of Justice; and (iv) it shall not require the disclosure of any information protected by the attorney-client or work product privileges. A failure to make information available under this sub-paragraph shall not be considered a breach of this Agreement pursuant to paragraph 17, but the new standard of conduct shall not be modified during the term of the Agreement without the consent of the Department of Justice.

8.    AOL also agrees that with respect to any waiver of privilege, its cooperation shall entail the following:

a. Not asserting a claim of attorney-client or work-product privilege as to contemporaneous legal advice or opinion given to AOL personnel regarding a transaction, or any documents, information, or testimony related to any factual internal investigation conducted: (i) prior to November 28, 2001 concerning the PPRO Transactions; or (ii) prior to May 1, 2002, concerning any specifically identified Covered Transaction as deemed necessary by the Department of Justice to investigate, charge or prosecute any individual in connection with the PPRO Transactions. Any such material provided to the Department of Justice pursuant to this subparagraph will be governed by the Confidentiality Agreement effective November 26, 2003, entered into by the Department of Justice, AOL and Time Warner Inc. ("Confidentiality Agreement"). In making production of any such material, AOL neither expressly nor implicitly waives its right to assert any privilege that is available under law against entities other than the Department of Justice concerning the produced material or the subject matters thereof. This waiver provision does not extend to: (i) defense or current representation materials; (ii) opinion work-product or legal advice based on any internal investigation; or (iii) any privileged material generated on or after May 1, 2002 (or with respect to the PPRO Transactions, on or after November 28, 2001).

b. If the Department of Justice, in furtherance of a criminal investigation concerning any of the Covered Transactions, requests production of material protected by the attorney-client or work-product privileges pursuant to this

subparagraph 8.b, and if AOL does not comply with such request, it shall not be considered a breach of this Agreement pursuant to paragraph 17, but the Department of Justice may, in its sole discretion, withdraw its release of liability set forth in paragraph 4.c with regard to the transaction subject to the request. Any such request for privileged material will not extend beyond any contemporaneous legal opinion or advice given to AOL personnel regarding a transaction, or any documents, information, or testimony regarding a factual internal investigation, and will not require the production of any defense or current representation material, opinion work product or legal advice related to or based on any internal investigation, or any privileged material generated on or after May 1, 2002. Any privileged material provided to the Department of Justice pursuant to this subparagraph will be governed by the Confidentiality Agreement, and will not constitute an express or implied waiver of AOL's right to assert any privilege that is available under law against entities other than the Department of Justice concerning the produced material or the subject matters thereof.

9.     Within 10 days of the entry of an order by the Court approving this Agreement, AOL agrees to pay $150,000,000.00 into a compensation and settlement fund to be established under its direction and control to be used for either the settlement of shareholder securities law litigation or for purposes of any compensation fund established by any federal or state agency, related to or arising from the PPRO Transactions or the Covered Transactions, including the accounting for the transactions and the statements, disclosures, or omissions related to the transactions. No moneys from this fund, however, shall be used to satisfy any monetary penalties imposed by the SEC or any law enforcement agency. None of the proceeds of the fund shall be payable as attorney's fees. All costs of administering the account are to be borne by AOL. In the event of termination of this Agreement pursuant to paragraph 17 below, any amounts still remaining in this account may be reclaimed by AOL and used for any purpose. To the extent any money in the escrow account is not used within three (3) years, AOL shall transfer the remaining amount to the United States Treasury and execute any documents necessary to effectuate such transfer.

10.     Within 10 days of the entry of an order by the Court approving this Agreement, AOL agrees to pay $60,000,000.00 to the United States Treasury as a monetary penalty. In the event of any termination of this Agreement pursuant to paragraph 17 below, any amounts paid by AOL as a penalty shall not be returned to AOL, but shall be credited by the Department of Justice against any amounts in the future determined or agreed to be owing by AOL as a monetary penalty in this matter.

11.     AOL authorizes the Department of Justice and the SEC to share information from and about AOL with each other and hereby waives any confidentiality accorded to that information by law, agreement or otherwise that would, absent authorization by AOL, prohibit or limit such sharing. No further waivers of confidentiality shall be required in that regard.

12.     AOL further agrees that it will not, through its present or future attorneys, board of directors, agents, affiliates, parent, officers or employees, make any public statement, including statements or positions in litigation in which any United States department or agency is

a party, contradicting any statement of fact set forth in the Statement of Facts attached at Appendix A. Any such willful, knowing and material contradictory public statement by AOL, its present or future attorneys, board of directors, agents, officers or employees, shall constitute a breach of this Agreement, and AOL thereafter would be subject to prosecution as set forth in paragraph 17 of this Agreement. The decision of whether any public statement by any such person contradicting a statement of fact contained in the Statement of Facts will be imputed to AOL for the purpose of determining whether AOL has breached this Agreement shall be at the sole reasonable discretion of the Department of Justice. If and when the Department of Justice determines that such a contradictory statement has been made by AOL, the Department of Justice shall so notify AOL and AOL may avoid a breach of this Agreement by publicly repudiating such statement within three business days after notification by the Department of Justice. This paragraph is not intended to apply to any statement made by any individual in the course of any criminal, regulatory, or civil case initiated by the government against such individual, unless such individual is speaking on behalf of AOL. Consistent with AOL's obligation not to contradict any statement of fact set forth in the Statement of Facts, AOL may take good faith positions in litigation involving any private party.

13.    AOL agrees that for the time-period of this Agreement, it will retain and pay for an independent Monitor, who will be mutually agreed upon by the Department of Justice and AOL. The Monitor will undertake a special review of: the effectiveness of AOL's internal control measures related to its accounting for advertising and related transactions; the training related to these internal control measures; AOL's deal sign-off and approval procedures; and AOL's corporate code of conduct. AOL agrees to cooperate with the Independent Monitor.

The Monitor shall:

a. have access to any information provided by AOL to the Department of Justice, however with respect to privileged materials, access will be limited to those materials that have been provided by AOL to the Department of Justice and that access shall be subject to the terms of the Confidentiality Agreement;

b. monitor the adequacy and effectiveness of AOL's internal control measures, including the Time Warner internal audit monthly activity report and compliance committee log, the training related to these internal control measures, signoff and approval procedures and corporate code of conduct;

c. make a report on the effectiveness of AOL's internal control measures related to its accounting for transactions involving AOL's sale of on-line advertising and related transactions and of AOL's deal sign-off and approval procedures and corporate code of conduct to Time Warner's Audit and Finance Committee, with a copy to the Department of Justice;

d. make recommendations to Time Warner's Audit and Finance Committee as to any needed improvements, revisions or new policies or procedures necessary to ensure the effectiveness of AOL's internal control measures, policies or procedures;

    e.  report to the Department of Justice on at least a semi-annual basis, as to AOL's cooperation with the Monitor;

    f.  have the right to select and hire outside accounting expertise if necessary to assist in the review; and

    g.  have the authority to extend the period of review for up to an additional six months, with Department of Justice approval.

       The Monitor will be independent. AOL agrees that there shall be no limitations on any sharing of information by the Monitor with the Department of Justice.

    14.   With respect to any information, testimony, document, record or other tangible evidence provided to this Agreement pursuant to this Agreement, AOL consents to any and all disclosures to the SEC and law enforcement entities of such materials as the Department of Justice, in its sole reasonable discretion, deems appropriate in furtherance of its criminal investigation of any individuals related to the subject matters.

    15.   The Department of Justice agrees that if AOL is in full compliance with all of its obligations under this Agreement, the Department of Justice, within thirty (30) days of the expiration of twenty-four (24) months from the date of this Agreement, will seek dismissal with prejudice of the criminal complaint filed against AOL pursuant to paragraph 1.

    16.   AOL shall waive all rights to a speedy trial pursuant to the Sixth Amendment of the United States Constitution, Title 18 United States Code, Section 3161, Federal Rule of Criminal Procedure 48(b), and any applicable Local Rules of the United States District Court for the Eastern District of Virginia for the period that this Agreement is in effect.

    17.   It is further understood that should the Department of Justice, in its reasonable discretion and in good faith, determine that AOL willfully and knowingly has given materially false, incomplete, or misleading information under this Agreement, or has committed any Federal Crimes (as defined below) subsequent to the date of this Agreement, or that AOL otherwise has breached this Agreement by willfully, knowingly and materially violating any provision of this Agreement, this Agreement shall become null and void and AOL shall, in the Department of Justice's reasonable discretion, thereafter be subject to prosecution for any federal criminal violation, including prosecution for acts subject to the release of liability in paragraph 4 relating to the PPRO Transactions or the Covered Transactions. Any such prosecutions may be premised on information provided by AOL. Moreover, with respect to any prosecutions relating to the PPRO Transactions or the Covered Transactions that are not time-barred by the applicable statute of limitations on the date of this Agreement, AOL agrees that the applicable statute-of-limitations period for any such prosecutions shall be tolled for a period of time equal to the term of this Agreement, so that such prosecutions may be commenced against AOL in accordance with this Agreement, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the expiration of this Agreement. AOL's tolling of the statute of limitations is knowing and voluntary and in express reliance on the advice of counsel. As used in this paragraph, Federal Crimes is limited to: (i) financial fraud related to AOL's business activities committed by AOL officers or directors at or above the level of Senior Vice President;

(ii) financial fraud materially affecting the books and records or financial reports of AOL or another company; or (iii) obstruction of justice.

18.    It is further agreed that in the event that the Department of Justice, in its reasonable discretion and in good faith, determines that AOL has committed a willful and knowing material breach of this Agreement as described in paragraph 17, then AOL, in any pleading or at any proceeding or trial:

    a.    Will stipulate to the admissibility into evidence of the Statement of Facts and agrees not to offer any contradictory evidence or arguments;

    b.    Agrees that all statements made by or on behalf of AOL, including testimony given by AOL and any employee (current or former) before a grand jury, the SEC, or elsewhere, shall be admissible in evidence in any and all criminal proceedings brought by the Department of Justice against AOL; and

    c.    Shall not assert any claim under the United States Constitution, Rule 410 of the Federal Rules of Evidence, or any other rule, that statements made by or on behalf of AOL prior to or subsequent to this Agreement, or any leads derived therefrom, should be inadmissible or suppressed.

19.    The decision whether conduct and statements of any individual will be imputed to AOL for the purpose of determining whether AOL has committed a willful and knowing material breach of this Agreement shall be in the sole reasonable discretion of the Department of Justice.

20.    Should the Department of Justice determine in its reasonable discretion and in good faith that AOL has committed a willful and knowing material breach of any provision of this Agreement, the Department of Justice shall, within 30 days of its discovery of the events giving rise to the alleged breach, provide written notice to AOL of the alleged breach and provide AOL with a two-week period in which to make a presentation to the United States Attorney for the Eastern District of Virginia and the Assistant Attorney General in charge of the Criminal Division, or their designee, to demonstrate that no breach has occurred, or, to the extent applicable, that the breach is not a willful and knowing material breach or has been cured. The parties hereto expressly understand and agree that should AOL fail to make a presentation to the United States Attorney for the Eastern District of Virginia and the Assistant Attorney General in charge of the Criminal Division, or their designee, within a two-week period, the Department of Justice in its sole, reasonable discretion may presume that AOL is in willful and knowing material breach of this Agreement. The parties further understand and agree that prior to the filing of an indictment against the Company, the United States Attorney's and Assistant Attorney General's exercise of discretion under this paragraph is not subject to judicial review.

21.    AOL agrees that if it sells or merges all or substantially all of its business operations as they exist as of the date of this Agreement to or into a single purchaser or group of affiliated purchasers during the term of this Agreement, it shall include in any contract for sale or merger a provision binding the purchaser/successor to the obligations described in this Agreement.

22.     It is understood that this Agreement is binding on AOL, the Department of Justice Criminal Division and the United States Attorneys' Offices for the Eastern District of Virginia and the Central District of California, but specifically does not bind any other federal agencies, or any federal, state or local law enforcement agency or licensing authorities, although the Department of Justice will bring the cooperation of AOL and its compliance with its other obligations under this Agreement to the attention of federal, state and local law enforcement agencies or licensing authorities, if requested by AOL or its attorneys.  Furthermore, nothing in this Agreement restricts in any way the ability of the United States Attorneys' Offices for the Eastern District of Virginia and the Central District of California, or the Department of Justice Criminal Division from proceeding against any individuals.  It is the intent of the parties to this Agreement that the Agreement does not confer or provide any benefits, privileges or rights to any individual or other entity other than the parties hereto.  AOL may raise defenses and/or assert affirmative claims in any civil proceedings brought by private parties as long as doing so does not otherwise violate any term of the Agreement.

23.     Except as provided in paragraph 4 above, this Agreement expires two years from the date of its execution; provided that if on such date any investigation, prosecution or proceeding relating to the PPRO Transactions or Covered Transactions is ongoing that is being conducted by the Department of Justice, or any other federal law enforcement agency with which AOL has been directed by the Department to cooperate pursuant to paragraph 5, then the cooperation provisions of paragraph 6, 7 and 8 shall continue until such investigation, prosecution or proceeding concludes, but in no event shall the obligations continue longer than an additional one year after the expiration of this Agreement.  Between thirty and sixty days before the expiration of this Agreement, AOL shall submit to the Department of Justice a written certification that it is in compliance with this Agreement.

24.     AOL hereby warrants and represents that the Board of Directors of AOL has duly authorized, in a specific resolution, the execution and delivery of this Agreement by AOL, and that the person signing the Agreement has authority to bind AOL.

25.     This Agreement may not be modified except in writing signed by all the parties.

26.     This Agreement may be executed in counterparts.

27.     AOL and the Department of Justice agree that, upon filing of the criminal complaint in accordance with paragraph 1, this Agreement shall be filed publicly in the United States District Court for the Eastern District of Virginia.

28.     This Agreement sets forth all of the terms of the Deferred Prosecution Agreement between AOL and the Department of Justice.  No modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Department of Justice, AOL and a duly authorized representative of AOL.

On behalf of the United States,

_____          _____
Paul J. McNulty                                            Date
United States Attorney
United States Attorney's Office
Eastern District of Virginia

_____          _____
Kevin V. Di Gregory                                     Date
Deputy Criminal Chief
United States Attorney's Office
Eastern District of Virginia

_____          _____
Charles F. Connolly                                      Date
Dana J. Boente
Assistant United States Attorneys
United States Attorney's Office
Eastern District of Virginia

_____          _____
Joshua R. Hochberg                                     Date
Chief, Fraud Section
Criminal Division
United States Department of Justice

_____          _____
Adam A. Reeves                                          Date
Trial Attorney, Fraud Section
Criminal Division
United States Department of Justice

On behalf of AOL

_____
Jonathan Miller
Chairman and Chief Executive Officer
America Online, Inc.

12/14/04
Date

APPENDIX A

## IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 1:04 M 1133 |
| | ) | |
| AMERICA ONLINE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## STATEMENT OF FACTS

**A.    AOL and Time Warner**

1.    Prior to on or about January 11, 2001, America Online, Inc. (hereinafter "AOL"), was a publicly-owned corporation organized and existing under the laws of the State of Delaware and based in Dulles, Virginia in the Eastern District of Virginia. AOL was a leader in interactive services, web brands, Internet technologies, and electronic commerce services, and engaged in the sale of, among other things, Internet subscriptions and advertising.

2.    On or about September 13, 2000, AOL launched its Netscape NetBusiness platform, which was designed to be an Internet site dedicated to providing interactive services to the small business community.

3.    On or about January 11, 2001, AOL and Time Warner Inc. consummated a merger. Following the merger, AOL operated as a separate division and wholly-owned subsidiary of the combined company, which was named AOL Time Warner Inc.

4.    On or about October 16, 2003, AOL Time Warner Inc. changed its name to Time

1

Warner Inc. (hereinafter "TWI"). TWI is a publicly-owned corporation organized and existing under the laws of the State of Delaware and based in New York, New York. Among other things, TWI engages in the sale of broadcast and print media products.

5.      Prior to on or about January 11, 2001, the common stock of TWI and AOL was publicly traded on the New York Stock Exchange. After the merger, the common stock of TWI continued to be publicly traded on the New York Stock Exchange, and was bought and sold by individuals and entities throughout the United States, including the Eastern District of Virginia.

6.      AOL's Business Affairs and Interactive Marketing groups were primarily responsible for negotiating contracts, advertising deals and marketing arrangements with customers.

**B.      PurchasePro.com**

7.      PurchasePro.com, Inc. ("PurchasePro") was a publicly-owned corporation duly organized and existing under the laws of the State of Nevada and based in Las Vegas, Nevada. The common stock of PurchasePro was publicly traded on the National Market of the National Association of Securities Dealers Automated Quotations System ("NASDAQ"). PurchasePro's common stock was bought and sold by individuals and entities throughout the United States including the Eastern District of Virginia. Among other things, PurchasePro engaged in the sale of Internet procurement software and services.

8.      By the third quarter of 2000 and continuing through 2001, PurchasePro's principal product was a form of Internet software known as a "marketplace license" used for business-to-business or "B2B" commerce. As promoted by PurchasePro, the marketplace license allowed small and large businesses to buy and sell products on the Internet in a cost-

2

efficient manner.

9.     In addition to its marketplace licenses, PurchasePro also sold re-seller marketplace licenses, preferred supplier agreements, hosting and maintenance services and "bulk" subscriptions.

**C.     Securities Regulation**

10.     The Securities and Exchange Commission ("SEC") was an agency of the United States responsible for the review of financial statements and reports of the issuers of securities. The SEC relies on the accuracy and truthfulness of the reports filed with it.

11.     As publicly-traded companies, TWI, AOL and PurchasePro and their directors, officers and employees were required to comply with the federal securities laws and regulations. Those laws and regulations were designed to ensure that the financial information of publicly-traded companies was accurately recorded and disclosed to the investing public.

12.     Under the federal securities laws and regulations, TWI, AOL and PurchasePro were required, among other things: (a) to make and keep books, records and accounts that accurately and fairly reflected the business transactions of the respective companies; (b) to file with the SEC quarterly reports (known as a SEC Form 10-Q), annual reports (known as a SEC Form 10-K) and other periodic reports that included accurate and reliable financial statements prepared in accordance with Generally Accepted Accounting Principals ("GAAP").

13.     TWI, AOL and PurchasePro were required to retain outside public auditors to review, audit and test their respective financial statements for compliance with appropriate accounting rules.

3

**D.**     **The AOL-PurchasePro Strategic Partnership**

14.     On or about March 15, 2000, PurchasePro and AOL entered into a series of contractual agreements, including the Interactive Marketing Agreement ("IMA"), the Technology Development Agreement ("TDA") and the Warrant Agreement. The IMA obligated PurchasePro to pay AOL $50 million in cash; $25 million upon signing and $3.57 million each quarter for seven consecutive quarters ending December 2001. The TDA obligated PurchasePro to pay AOL a total of $20 million in increments of $2.5 million per quarter beginning in or about August 2000. These payments were intended to reimburse AOL for the development costs associated with building AOL's internet platform. The Warrant Agreement provided AOL with 500,000 PurchasePro warrants and allowed AOL to earn up to 1,500,000 performance warrants based upon certain criteria and PurchasePro revenue thresholds.

15.     The agreements were intended to create a strategic partnership between AOL and PurchasePro in which the companies would co-develop a business-to-business global marketplace on AOL's Netscape NetBusiness service.

16.     As of the close of the third quarter of 2000, PurchasePro had not met any of the revenue thresholds established by the Warrant Agreement and AOL had not earned any performance warrants.

17.     On or about December 29, 2000, AOL and PurchasePro amended the Warrant Agreement to modify the criteria and revenue thresholds necessary for AOL to earn the performance warrants. The parties made the Amendment effective as of November 18, 2000. The amended Warrant Agreement also accounted for the intervening 2-for-1 split of PurchasePro's common stock. Therefore, AOL could earn up to 3 million performance warrants.

4

The value of the warrants that AOL could earn was capped at $30 million for the fourth quarter of 2000, $45 million for the first quarter of 2001 and $60 million for the second quarter of 2001. The value was to be determined by an agreed-upon formula that allowed AOL to earn warrants with a value of $3 for each dollar of revenue PurchasePro recognized as a result of a third party revenue referred to PurchasePro by AOL. In short, AOL earned $3 in warrants for each $1 of revenue it referred to PurchasePro.

**E.    AOL Officers and Employees Aided and Abetted PurchasePro's Fraud**

18.    From in or about September 2000 to in or about June 2001, in the Eastern District of Virginia and elsewhere, six or more AOL officers and employees, in exchange for increased revenue to AOL in the fourth quarter of 2000 and the first quarter of 2001, aided and abetted PurchasePro officers' false and fraudulent inflation of PurchasePro's revenues as reported to the investing public in the fourth quarter of 2000 and the first quarter of 2001.

**Third Quarter of 2000**

19.    In or about September 2000, a Business Affairs employee agreed on behalf of AOL to purchase ten re-seller marketplace licenses from PurchasePro for a total cost of $2 million in an effort to help PurchasePro exceed analyst estimates for third quarter 2000 revenue and in exchange for PurchasePro's agreement to amend the Warrant Agreement. AOL purchased these re-seller marketplace licenses without having a need for them and without any intention of using the licenses.

20.    On or about October 11, 2000, the same Business Affairs employee, on behalf of AOL, falsely confirmed in writing to PurchasePro's outside auditors that there were "no other contracts or agreements as to terms, whether written or oral, between PurchasePro and AOL that

5

relate" to the purchase of $2 million re-seller marketplace licenses when in fact the employee

knew that the re-seller licenses were bought in exchange for the promise to amend the warrant

agreement in the future.

### Fourth Quarter of 2000

21.     In or about December 2000, at least two Business Affairs employees agreed on

behalf of AOL to purchase approximately $10 million of products from PurchasePro in exchange

for PurchasePro's agreement to grant AOL $30 million worth of PurchasePro warrants.  To

fulfill this agreement, on or about December 21, 2000, AOL entered into a Bulk Subscription

Sales Agreement that required AOL to purchase from PurchasePro approximately 100,000

Promotional Subscriptions at $49 each for a total of $4.9 million.  AOL also purchased 5

marketplace licenses for a total of approximately $4.6 million.

22.     On or about December 21, 2000, PurchasePro senior officers, with the assistance

and knowledge of AOL officers and employees, sent a letter to AOL indicating that PurchasePro

had earned over $10 million in recognizable revenue in the fourth quarter of 2000 and therefore

that AOL had earned warrants valued at $30 million.

23.     AOL officers and employees learned, however, that PurchasePro's outside

auditors would require PurchasePro to net any revenue received directly from AOL against the

$30 million in warrants.  Simply put, AOL officers and employees learned that the exchange of

approximately $10 million in direct purchases for the $30 million in warrants would result in no

recognizable revenue for PurchasePro.  Therefore, AOL officers and employees assisted

PurchasePro officers in concealing the true nature of the agreement from PurchasePro's outside

auditors, by doing the following:

6

a.    In or about the fourth quarter of 2000, a Business Affairs employee and an Interactive Marketing employee, on behalf of AOL, signed referral forms falsely indicating that AOL had referred a number of companies that purchased marketplace licenses from PurchasePro in the fourth quarter 2000;

b.    On or about February 7, 2001, a Business Affairs employee caused another Business Affairs employee to execute a letter that purported to "clarify ambiguities" in the Amended Warrant Agreement by stating that AOL could not earn warrants as a result of revenue resulting from products sold directly from PurchasePro to AOL; and

c.    On or about February 8, 2001 a Business Affairs employee signed a letter to PurchasePro's auditors that falsely stated that there were no additional written or oral agreements relating to the revenues resulting from AOL's purchase of marketplace licenses for approximately $4.6 million in the fourth quarter of 2000, when in fact that employee knew that the $4.6 million purchase was part of the exchange for the $30 million in warrants.

24.    On April 2, 2001, PurchasePro filed its annual report on Form 10-K for fiscal year ending December 31, 2000, falsely reporting annual revenues of approximately $65 million and revenues for the fourth quarter of 2000 of approximately $33.59 million. The Form 10-K also falsely stated that AOL referred $10.5 million of revenue to PurchasePro. The Form 10-K was filed electronically with the EDGAR Management Office of Information and Technology in Alexandria, Virginia in the Eastern District of Virginia.

7

**First Quarter of 2001**

25.     In the first quarter of 2001, two Business Affairs employees and an Interactive Marketing employee agreed to assist PurchasePro in selling marketplace licenses to AOL's customers and partners through the use of undocumented guarantees, oral promises, or other propositions designed to ensure that the purchaser would not suffer any net financial loss as a result of the marketplace license purchase. AOL officers and employees agreed to reach secret side agreements with license purchasers or commit to "sweeteners" that included, among other things: (i) promises to reduce by a specified dollar value future payments the marketplace license purchasers already were contractually obligated to pay AOL; (ii) promises to provide a specified dollar value worth of on-line advertisements or carriage on AOL's Internet properties; (iii) promises by AOL to buy more products from its suppliers; (iv) promises by AOL to buy its products from suppliers at a higher price; or (v) combinations of two or more such promises.

26.     AOL had an economic incentive to help sell PurchasePro marketplace licenses in the first quarter of 2001 because PurchasePro promised to give AOL, among other things: (i) a 50% commission for each marketplace license that AOL sold on PurchasePro's behalf; and (ii) $3.00 worth of PurchasePro warrants under the amended Warrant Agreement for each $1.00 of referred revenue recognized by PurchasePro in the first quarter of 2001.

27.     During the final weeks of the first quarter of 2001, AOL employees made oral promises to numerous customers or partners in order to induce the customer's or partner's purchases of marketplace licenses. These undocumented promises and agreements resulted in at least nine marketplace license sales by PurchasePro in the first quarter of 2001 for a total of approximately $8.1 million.

8

28.     During the final weeks of the first quarter of 2001 and continuing after the close of the first quarter into April 2001, two Business Affairs employees pursued ways to further assist PurchasePro with its quarterly revenue numbers and eventually agreed to an Amendment to the Bulk Subscriptions Agreement. Pursuant to the Amendment, AOL agreed to once again purchase bulk subscriptions from PurchasePro for AOL's Netbusiness customers. At or about the close of the first quarter of 2001, these employees agreed on behalf of AOL to purchase subscriptions covering January, February and March 2001 for a total of approximately $9 million. AOL's NetBusiness users, however, were not made aware of these free subscriptions to the PurchasePro marketplace until late March 2001.

29.     In or about the last days of March 2001, a Business Affairs employee agreed to further assist PurchasePro's efforts to meet its first quarter revenue estimates by agreeing that AOL would pay PurchasePro approximately $3.65 million for integration work allegedly performed by PurchasePro in the first quarter of 2001. On or about Saturday, March 31, 2001, a NetBusiness employee assisted PurchasePro employees in this endeavor by providing PurchasePro with language for the contract, called a Statement of Work, formalizing this agreement. AOL employees knew that the work necessary to support AOL's payment of approximately $3.65 million to PurchasePro had not been completed in the first quarter of 2001. Indeed, AOL employees were aware that PurchasePro employees were still drafting the Statement of Work, which defined the work necessary for the integration and the $3.65 million payment, during the first week of April 2001.

30.     Nevertheless, a NetBusiness employee falsely confirmed to PurchasePro's outside auditors that the work had been completed. Subsequently, a second NetBusiness employee

9

signed a confirmation letter on behalf of AOL for PurchasePro's outside auditors that falsely stated, among other things, "all work covered under the Statement of Work dated February 5, 2001 was completed and accepted as of March 30, 2001."

31.    On or about April 24, 2001, a NetBusiness employee participated in a telephone conference call with one of PurchasePro's outside auditors and again falsely confirmed that the integration work under the Statement of Work had been completed by March 31, 2001.

32.    At the close of the first quarter of 2001, PurchasePro issued warrants to AOL under the amended Warrant Agreement that were valued at approximately $7.7 million. This warrant revenue, which was recognized by AOL, was based entirely on the sale of one marketplace license for $3.7 million to a customer allegedly referred to PurchasePro by AOL. In fact, AOL did not refer the customer. Nevertheless, a Vice President in Interactive Marketing signed, on behalf of AOL, a referral form falsely representing that AOL had referred the purchaser.

33.    On or about March 31, 2001, two Business Affairs employees and an Interactive Marketing employee demanded that PurchasePro pay AOL $12.2 million as payment for commissions allegedly earned by AOL from its first quarter 2001 marketplace license sales campaign. In fact, the two Business Affairs employees and the Interactive Marketing employee knew that AOL had not earned the full $12.2 million in commissions but had earned only about $6.7 million in commissions, and much of that was from undocumented and undisclosed side deals. But the AOL officers and employees knew that in order to recognize all $12.2 million in commission revenue in the first quarter of 2001, the check had to be received by midnight on March 31, 2001. Therefore, a senior executive at PurchasePro personally delivered to AOL a

10

hand written check for $12.2 million.

34.    As of the close of the first quarter of 2001, PurchasePro was well short of meeting its revenue estimates. Knowing that PurchasePro's officers were "keeping the quarter open" in an effort to close the gap, and in order to "earn" the $12.2 million in first quarter commissions for which AOL had already been paid, at least two Business Affairs employees agreed to continue to sell PurchasePro marketplace licenses to AOL customers and partners. To disguise the efforts to sell marketplace licenses after the close of the quarter, an AOL employee facilitated the back-dating of the contracts to make it appear that the contracts were signed by the close of the first quarter of 2001. These efforts resulted in at least two additional marketplace license sales with a total value of approximately $6.7 million being back-dated into the first quarter of 2001.

35.    On or about April 5, 2001, at least two Business Affairs employees and a Senior Vice President within Business Affairs, on behalf of AOL, executed or caused to be executed the Amended Bulk Subscription Agreement dated "as of March 31, 2001" that required AOL to pay PurchasePro a total of approximately $9 million for bulk subscriptions in January, February and March 2001.

36.    On or about April 18, 2001, a NetBusiness employee wrote an e-mail to another AOL employee discussing the efforts to justify the $9 million Amended Bulk Subscriptions Agreement. The e-mail stated in part: "This is the scoop. During the week of 4/5 [two Business Affairs employees] had to make [PurchasePro senior executive] whole to help him make his numbers. [$]9M[illion] in subscriptions was something [AOL employees] put together because we couldn't sell enough marketplaces despite best efforts."

11

37. On April 26, 2001, PurchasePro publicly announced that it had earned approximately $29.8 million in revenue for the quarter ended March 31, 2001.

38. On May 29, 2001, PurchasePro filed its quarterly report on Form 10-Q for the quarterly period ending March 31, 2001, reporting quarterly revenues totaling approximately $16.02 million. The Form 10-Q was filed electronically with the EDGAR Management Office of Information and Technology in Alexandria, Virginia in the Eastern District of Virginia.

**F. Conclusion**

39. As a result of the actions of its officers and employees, AOL aided and abetted PurchasePro's officers in reporting at least $10 million – or approximately 1/3 of the quarterly revenue included in the From 10-K – in false revenue in the fourth quarter of 2000 and at least $20 million – or nearly 2/3 of the total revenue publicly announced on April 26, 2001 – in false revenue in the first quarter of 2001.

40. As a result of aiding and abetting PurchasePro's officers' fraud, AOL was able to report approximately $20 million of additional revenue from PurchasePro in the Fourth Quarter of 2000 and approximately $15 million of additional revenue in the first quarter of 2001.

41. AOL acknowledges that venue is proper in the Eastern District of Virginia and waives any objection to venue in the Eastern District of Virginia as well as any objection to this Court's exercising jurisdiction in this matter.


There are other matters and facts known to the parties that are not included in this Statement of Facts.

12

## Appendix B

America Online, Inc. ("AOL") and its parent Time Warner Inc. ("Time Warner" or "the Company") have established a multi-level internal controls environment, including several controls directed specifically to AOL's accounting for advertising transactions.[1] The internal controls are intended to deter potential violations of AOL's and Time Warner's policies and procedures, detect and remediate any such violations that do occur, and promote a culture that encourages ethical conduct and a commitment to compliance with applicable laws and regulations.

### I.    Encouraging Employee Integrity

#### A.    Standards of Business Conduct

In 2004, Time Warner and AOL issued revised written Standards of Business Conduct (the "Standards"). The Standards, which expand pre-existing standards at AOL and Time Warner, are designed to educate employees on business conduct issues, promote honesty and compliance with laws, and prevent conflicts of interest. The Standards contain numerous provisions related to the integrity of the Company's financial records, including provisions guarding against false, artificial, or misleading statements or entries in Time Warner's books and records and procedures for submitting complaints to the Company (confidentially and anonymously, if desired). The Standards also provide for a supplemental Code of Ethics for the Company's senior executives and senior financial officers (described below).

Training on the revised Standards is complete for Time Warner Corporate employees and complete or underway at the various divisions. At the AOL division, for example, the revised Standards are in the process of being distributed in hardcopy as part of ongoing training sessions. At the AOL division alone, more than 12,000 domestic employees are targeted to have completed training by year's end. During the training at AOL, employees are educated about channels for voicing questions and concerns, including a toll-free help line, a business conduct e-mail address, a fax number and a postal address, which are available to employees seeking advice on business conduct issues or desiring to report concerns about potential business conduct violations (employees may seek advice or report a concern anonymously through the toll free help line or conventional mail). The training also emphasizes that AOL is committed to an ethical culture where

---

[1]    This appendix is not intended to be an exhaustive catalogue of the internal controls in place at Time Warner, AOL, or the other divisions of Time Warner. In particular, the appendix does not focus on controls at Time Warner that are directed primarily at divisions other than AOL.

employees ask questions and raise concerns, and where retaliation is not tolerated. AOL has selected a vendor to provide online, subject matter-specific training to all employees in 2005.

Time Warner maintains an additional Code of Ethics for Senior Executives and Senior Finance Officers. The Company requires the Time Warner CEO, group chairpersons, President, COO, CFO, Controller, Deputy Controller, and senior-most tax executive (and others performing similar senior executive functions from time to time in the future) to review and sign the Code of Ethics. The Company also requires the CFO and Controller of each principal division (including AOL) to review and sign the Code of Ethics. The Code obligates these personnel to, *inter alia*, promote honest and ethical conduct; promote full, fair, accurate, timely, and understandable disclosures; comply with applicable laws, rules, and regulations; report promptly any possible violations of the Code of Ethics to the Time Warner Compliance Officer or any of the parties or channels listed in the Standards of Business Conduct; and refrain from taking actions intended to mislead the Company's internal accountants or outside auditors. Senior employees and employees likely to have access to material non-public information must also abide by Time Warner's Supplemental Trading Policies.

Time Warner has also created a Code of Ethics for its non-employee directors, which incorporates relevant provisions of the Standards of Business Conduct and conflicts of interest rules.

**B.    Employee Screening and Monitoring**

AOL screens new employees before they are hired. All domestic employees undergo a criminal background check prior to employment. AOL is in the process of implementing an enhanced background check process for all domestic new hires and internal promotions to positions of substantial authority.

AOL also requires all employees at the Vice President level and above to complete and return a Conflicts of Interest Questionnaire, which addresses matters such as investments in AOL competitors and partners, gifts from business partners, and nepotism. By completing the questionnaire, AOL employees acknowledge that their responsibilities include an obligation to report any fraudulent conduct or other dishonesty in their area of supervision to their supervisor (who is required to forward reports of wrongdoing to the AOL Business Conduct & Compliance group (discussed below)), the AOL General Counsel and Compliance Officer, or the Business Conduct & Compliance group.

### C.    Fostering and Monitoring Employee Integrity

#### 1.    AOL Division-level Monitoring and Enforcement

AOL monitors compliance with the Standards of Business Conduct through a variety of means:

**The Business Conduct & Compliance Group.** In the summer of 2003, AOL hired an Assistant General Counsel to focus full-time on integrating the Standards into AOL's business. AOL has also formed the Business Conduct & Compliance ("BCC") group within the AOL Legal department. The BCC group coordinates compliance issues AOL-wide to ensure consistency in the Standards' application, and investigates all reports of potential wrongdoing (with the exception of EEO and sexual harassment reports, which are referred to AOL's Human Resources ("HR") department).

The BCC group is AOL's principal clearinghouse for compliance information. It receives compliance information from AOL's toll-free, anonymous help line and from correspondence sent to the business compliance fax line and mail and email addresses. The BCC group also receives information regarding business conduct issues from the SBC Advisors (see below) and requests updates on business conduct issues on a quarterly basis from other AOL departments, such as HR and Finance. In addition, BCC members meet with representatives of the Time Warner Internal Audit group on a quarterly basis to discuss any compliance issues raised in internal audit reports.

Each quarter, the BCC group prepares AOL's Quarterly Compliance Officer Report to be submitted, after approval by AOL's General Counsel and Compliance Officer, to Time Warner Legal. Time Warner asks its divisions, including AOL, to include in their Quarterly Compliance Officer Reports all significant allegations of violations of the Standards of Business Conduct (excluding HR matters) that, if true, would likely result in Company exposure in excess of $50,000 or result in material harm to the reputation of Time Warner or its divisions. Any allegations of accounting complaints or false statements regarding financial and accounting matters, bribery, or kickbacks are to be reported to Time Warner, regardless of the amount of money involved. The divisions, including AOL, are to immediately report to Time Warner's Senior Compliance Officer any accounting matters that are both credible and material to the Division's financial reporting, condition or controls (or any other matters the divisional compliance office deems very significant).

**SBC Advisors.** In December 2003, AOL established a group of more than 25 Standards of Business Conduct Advisors ("SBC Advisors"). These AOL employees – primarily at the director and vice president level – are assigned to each of AOL's major domestic business divisions and every domestic AOL office with more than 100 employees. The SBC Advisors receive compliance training and attend quarterly

meetings with the BCC group. The SBC Advisors provide monthly reports to the BCC group that are to include, *inter alia*, any compliance concerns of which the Advisors are aware.

**AOL Compliance Council.** In September 2003, AOL formed a Compliance Council consisting of senior executives to oversee the business compliance and conduct program. The Compliance Council currently is composed of AOL's CFO; General Counsel and Chief Compliance Officer; an Executive Vice President of Human Resources; and an executive member-at-large. The Compliance Council meets on a quarterly basis to identify and address any trends in compliance activities, consider matters involving high-level managers, and set policy for AOL regarding the enforcement of the Standards and other matters of ethics and integrity. The AOL Compliance Council also is provided with AOL's Quarterly Compliance Officer Reports to Time Warner Corporate.

### 2.    Time Warner's Monitoring of Compliance Issues and Reporting to the Audit & Finance Committee

Time Warner has implemented a compliance coordination and monitoring effort. Each division of Time Warner has its own Compliance Officer, who provides reports to the Senior Compliance Officer for the Company (who also serves as the Compliance Officer for Time Warner Corporate). Representatives of the divisional compliance programs meet regularly to discuss the Standards, control procedures, and any substantive control issues that arise.

Time Warner's Compliance Committee consists of Time Warner's Senior Compliance Officer, Time Warner's Vice President and Deputy Controller, and representatives of Time Warner's Internal Audit, Corporate Security, and Corporate Legal departments. The Compliance Committee meets on a monthly basis to discuss compliance matters, such as allegations of fraud, misconduct, or other improprieties at Time Warner (including at its divisions), that raise concerns about ongoing conduct or potential weaknesses in current controls. The Compliance Committee maintains the Corporate Compliance Log ("Log"), which reflects certain of these matters. The Log is based on new information received through traditional compliance channels, such as direct communication from compliance officers and senior personnel at the divisions, Quarterly Compliance Officer Reports submitted by each division, quarterly representation letters from the divisions, email to Time Warner's Compliance Office, issues raised at periodic meetings between Time Warner's Senior Compliance Officer and representatives of the divisional compliance programs, and complaints made to Time Warner's anonymous toll-free number, as described in more detail above, and may not reflect information from outside the compliance program, such as matters handled by the HR department, those relating to certain customer and shareholder complaints, litigation and defense matters, and other matters subject to the attorney-client or work product privileges.

-4-

Time Warner also has created a Conflicts Committee, consisting of the Senior Compliance Officer, the General Counsel, and the CFO. The Committee reviews potential conflict situations involving senior personnel.

In addition, as part of its implementation of Section 307 of the Sarbanes-Oxley Act, Time Warner has adopted policies that exceed the requirements in 17 C.F.R. Part 205. In particular, Time Warner has exceeded the regulatory requirements, and the practice of most other large public companies, by designating the Time Warner Audit & Finance Committee as a Qualified Legal Compliance Committee ("QLCC"). By adopting this optional, additional control, Time Warner invested its Audit & Finance Committee with the authorities and responsibilities set out in 17 C.F.R. § 205.2(k), including, *inter alia*, the authority and responsibility to determine whether an investigation is necessary regarding any report of evidence of a material violation by the Company, its officers, directors, employees or agents, and authority and responsibility to notify the SEC in the event that the Company fails in any material respect to implement an appropriate response that the QLCC has recommended the Company to take.

Time Warner also exceeded the requirements of Sarbanes-Oxley by enacting a policy that mandates up-the-ladder reporting from all attorneys employed by the Company, including AOL and the other divisions, who provide legal services to the Company in the context of an attorney-client relationship, not merely those who "appear and practice" before the SEC. The Company's internal policy implementing Section 307 includes references to the relevant regulations and SEC guidelines and lists contact information for the QLCC's outside counsel to facilitate reporting of violations. All covered attorneys are required to undergo training on the SEC's rules and the broader Time Warner policy – which training emphasizes the importance of consulting with and reporting to supervisors and other designated parties concerning all violations of law. All covered attorneys also are required to certify in writing that they have read and understood the Company's policy and have been trained on and will comply with the Company's policy and the SEC's rules.

## II.    Transaction Process Controls

### A.    AOL Division Internal Transaction Approval Controls

In October 2002, AOL put in place a revision of its existing deal sign-off processes and procedures for complex, strategic, or non-standard transactions. The processes were further revised in the summer of 2004.

The current deal approval process, adopted in the summer of 2004, includes an initial "sign-up" procedure for certain complex, strategic, or non-standard deals, whereby the business unit engages in early consultation about the proposed deal structure with AOL Legal and Finance and key executives, business units, and

- 5 -

stakeholders in the transaction. AOL's deal negotiation team is required to prepare a summary of the potential deal. The summary must include the material terms of the proposed transaction, a financial and economic analysis of the proposed deal terms, the strategic rationale for the deal, and an overview of the deal partner, including an identification of any other transactions or negotiations with the same partner in the previous six months. Senior personnel from the business unit, the Legal and Finance departments, executive management, and key stakeholders, such as Network Operations or Marketing, must agree to move forward on the deal before formal proposal or term sheets may be delivered to the potential partner (although informal discussions with prospective deal partners may occur prior to approval of the sign-up summary).

Once proposed final deal terms are negotiated with a prospective partner, but before a contract can be executed by AOL, an additional, formalized "sign-off" process must be completed for certain complex, strategic, or non-standard deals. As part of the "sign-off" process, the lead business unit, AOL Finance personnel, and AOL's Legal and Tax departments are required to complete a written transaction summary. The transaction summary includes a "business unit summary" prepared by the lead business unit (in coordination with Legal and Finance) that includes (a) an executive summary consisting of any information helpful to a full understanding of the transaction, including, where applicable, a summary of the relationship of the transaction to other transactions or deals, AOL's business objectives, and key negotiation points; (b) a detailed description of AOL's obligations under the deal and the deal's key terms and impacts; (c) a financial analysis of the transaction, including a discussion of the P&L and budget impacts of the transaction; (d) a description of significant business risks; (e) a statement whether the transaction is related to, connected with, or negotiated in connection with any other transaction and a description of any such connection; and (f) a statement whether the parties agreed to terms that are not documented in the contract and a description of any such terms. Two AOL employees, the executive sponsor responsible for the deal – a Senior Vice President or above – and a representative from the lead business unit, must each certify in writing that the business unit summary is true and correct to the best of his or her knowledge.

In addition to the business unit summary, the transaction summary includes a summary by AOL Finance personnel describing the accounting treatment for the deal, explaining the accounting rationale, and identifying any significant issues affecting the accounting treatment and the differing levels of AOL and Time Warner accounting personnel approval required based on materiality and complexity; a statement by AOL Legal explaining significant legal risks and highlighting any significant legal, policy, or contractual matters that should be considered in connection with the transaction; and a summary of tax implications of the deal.

AOL also has in place specific guidelines describing which AOL employees are authorized to sign contracts on behalf of AOL. The guidelines, available to employees on the AOL intranet, also list the rules for delegating signature authority and contain a link to the guidelines governing which large transactions require prior approval by or reporting to the Time Warner Board of Directors.

In 2004, AOL created a Deal Council to oversee its deal approval process. The principal objectives of the Deal Council include stewardship of the "sign-up" and "sign-off" policies and procedures, the establishment of AOL-wide guidelines and rules for complex, strategic, or non-standard transactions, and the review and evaluation of deals after their execution. The Deal Council is comprised of representatives from AOL's principal deal negotiation teams, as well as AOL's Legal, Finance, and Strategic Planning departments.

### B.    Company-wide Consultation with Corporate

From August 2001 to the present, Time Warner has strengthened its requirement that certain division deals receive review and approval at the Time Warner Corporate level. For example, in August 2002 the Company began to require Corporate review and approval for all advertising contracts in excess of $1 million entered by the AOL division. Pursuant to these transaction approval guidelines, Time Warner Corporate requires that each Time Warner division, including AOL, submit a summary sign-off document for each such transaction subject to review. The divisions are asked to include in the summary: the name of the counterparty, the nature of the contract (e.g., advertising, programming, etc.), the dollar value of the contract, a statement explaining whether multiple elements are involved, an explanation of whether the contract is a cross-divisional arrangement, a list of any unusual or non-standard provisions, and the division's conclusion regarding accounting for the transaction.

Specifically in August 2001, Time Warner Corporate reissued contract approval guidelines, replacing guidelines that previously had been in place. The 2001 guidelines included a new set of requirements for certain transactions requiring review and approval by Corporate Finance. The transactions requiring Time Warner Corporate approval under the 2001 rules included: (a) barter advertising transactions (both intercompany and third-party) above $10 million in fair market value; (b) transactions involving more than two parties and valued at more than $20 million; (c) multi-element or buy/sell (cash or barter) transactions having reciprocal arrangements valued above $10 million; (d) all transactions involving transfer of Time Warner equity to non-employees; (e) all employee contracts involving the use of equity, other than at-the-money stock options pursuant to existing stock options plans; and (f) contracts involving the delivery of subscribers or advertising for consideration above $5 million.

The transaction approval guidelines have been modified over time as new requirements are imposed, new accounting rules are issued, new areas of focus arise, business models change, or the Company identifies areas of potential improvement. The current policy, revised in November 2004, lists more than twenty categories of contracts or occurrences requiring Corporate review and approval (if entered after November 1, 2004), including the following for all divisions: (a) changes in accounting policy that significantly affect a division, including changes in accounting principles and practices and changes in the methods of applying those accounting principles and practices; (b) agreements outside of the ordinary course of business in excess of $10 million, including any amendments outside of the ordinary course of business in excess of $10 million, as well as any termination of an agreement, not pursuant to its original terms, in excess of $10 million; (c) legal or dispute settlements where the consideration received or paid is other than cash or involves the recognition of revenue in excess of $5 million; (d) transactions with (or involving) newly created arrangements or modifications to existing arrangements with special purpose entities or variable interest entities; (e) contracts involving either intercompany or third-party barter transactions involving an exchange of advertising for advertising in excess of $5 million; (f) multiple-element or buy-sell (cash or barter) contracts having reciprocal arrangements in excess of $5 million, including any instances where a commercial dispute is being resolved/settled at or around the same time that a contract is being entered into, renewed, or amended with the same counter party with which the Company has the commercial dispute; (g) contracts in excess of $5 million where the proposed accounting will be different than the form of the contract (other than where explicitly provided for in generally accepted accounting principles ("GAAP"), such as a capital lease); (h) contracts involving more than two parties in excess of $10 million; (i) contracts involving Time Warner equity to non-employees; (j) employee contracts involving the use of equity, other than the granting of stock options or restricted stock pursuant to existing stock option plans; or (k) any transaction that is unusual in nature that significantly impacts divisional financial results not already identified above. In addition, the Corporate documentation and sign-off procedures apply to any accounting consultations noted in the quarterly divisional representation letter (discussed below), even if the transaction would otherwise fall outside the guidelines.

Since 2001, Time Warner has lowered the threshold for Corporate's review of certain contracts. Under the current policy, when compared with the 2001 policy, the threshold for contracts involving barter advertising requiring Corporate review was reduced from $10 million to $5 million; for contracts involving more than two parties from $20 million to $10 million; and for multi-element transactions having reciprocal arrangement from $10 million to $5 million.

Time Warner's revised policy includes changes specific to the AOL division as well, adding the requirement that AOL seek Corporate approval for transactions involving revenue-share buyout contracts in excess of $5 million; all advertising

contracts in excess of $1 million; and all contracts involving the delivery of subscribers or advertising for equity in excess of $5 million.

In addition, the Time Warner Controller's group maintains an Inquiry Database that enables Company Controller group and accounting and finance personnel to make informed and consistent decisions regarding complex transactions. The Inquiry Database, which also contains descriptions of transactions requiring Corporate approval and other significantly unusual or complex deals, is a searchable, electronic memory that facilitates consistent treatment of similar deals across Time Warner and its divisions, including AOL.

The Time Warner Controller's group discusses all unusual or complex deals with the Company's outside auditor in real time, as needed. In addition, representatives from the Company's Finance department and Controller's group meet formally with the Company's outside auditors on a quarterly basis to discuss complex and unusual transactions.

In addition to the reviews described above, the Company holds monthly Controller's meetings at which representatives of the division's Controller's groups discuss internal controls and best practices, emerging accounting rules, and business performance. Also, all divisional Chief Financial Officers meet regularly with Time Warner's CFO as part of the Company's efforts to assist in ensuring that Company management is aware of key business developments and important financial information. These meetings will help ensure that important business developments and key financial trends are included in the Company's SEC filings.

## III.    Disclosure Controls

Time Warner has put in place disclosure controls at the divisional and Corporate levels, including at AOL. Since 2002, AOL has increased its accounting headcount by twenty percent and added, within its Accounting Department, additional procedures to track AOL's advertising revenue and an additional group and new procedures to improve the accuracy of its reporting of its subscriber numbers.

**Quarterly Management Representation Letters.** During the second quarter of 2001, Time Warner began requiring the CEO, CFO, and Controller of each operating division, including AOL, to submit a quarterly management representation letter. The management representation letter has been modified over time as new requirements are imposed (such as under the Sarbanes-Oxley Act), new accounting rules are issued, new areas of focus arise, business models change, or the Company identifies areas of potential improvement. The AOL division's letter currently certifies that financial information submitted by AOL to the Time Warner Corporate Finance department is complete and accurate, prepared in accordance with GAAP, and compliant with instructions received from the Time

- 9 -

Warner Corporate Finance department. In addition, other key representations in the letter include: (a) that there are no significant changes to the system of internal controls; (b) that all significant balance sheet accounts are reconciled; (c) that the accounting implications of all significant, unusual, or complex transactions have been discussed with the Time Warner Corporate Finance department; and (d) that approvals for all contracts were obtained according to the applicable requirements of the contract approval guidelines.

In 2002, the representation letter policy was expanded to include a certification from each division's General Counsel, including at AOL. Beginning with the second quarter of 2004, AOL asks certain business unit leaders and their finance representatives to sign supporting representations for the CEO, CFO, and Controller regarding compliance with company policies, disclosure of oral agreements or certain other agreements, and disclosure of material breaches, amendments, or terminations of agreements.

**Quarterly Disclosures.** The Company's Disclosure Committee meets quarterly to discuss and review the Company's Form 10-Q or 10-K and other key matters to ensure that all necessary disclosures are incorporated. The Committee, consisting of representatives of the Tax, Investor Relations, Corporate Communications, Treasury, Internal Audit, Finance, and Legal departments, as well as the Office of the Chairman, also helps to ensure that key Company trends are disclosed. Once a final draft of the disclosures and financials is compiled, a certification meeting is held among the Time Warner CEO, CFO, inside and outside counsel, the outside auditor (Ernst & Young), Internal Audit, Investor Relations, Operations, and Finance.

Also on a quarterly basis, the Time Warner Controller's group performs various detailed analyses in reviewing the appropriateness of the Company's balance sheet, statement of cash flows, and income statement. Such analyses include the application of analytical procedures and detailed discussions with each division, including AOL, and other departments of Time Warner Corporate, including Treasury, Tax, Legal, and others. These analyses are intended to ensure that the Company's financial information is accurate and complies with GAAP and applicable SEC rules.

Each quarter, the Company Controller's group delivers a written report to the Time Warner Audit & Finance Committee and senior Company management discussing significant new areas of disclosure. In addition, the Controller's group periodically reports to the Audit & Finance Committee regarding significant areas of accounting judgment reflected in the Company's books and public filings.

## IV.    Other Principal Controls

### A.    Internal Audit

Beginning in 2001, the size and scope of Time Warner's Internal Audit function, including time allocated to AOL's businesses, has been greatly enhanced. In February 2002, the function was moved primarily in-house, and the Internal Audit plan was nearly doubled in terms of audit hours.  There are now 43 professionals in the group, and PricewaterhouseCoopers supplements the Internal Audit department, providing additional full-time employees with technical expertise in information technology and international operations.  The head of the Internal Audit department reports directly to the Chair of Time Warner's Audit & Finance Committee and provides regular updates to the Committee.

Prior to the start of each year, Internal Audit conducts an assessment of the principal compliance, financial, operational, and strategic risks confronting the Company and its divisions.  Based on that risk assessment and other factors, including the results of previous internal audits, Internal Audit creates an audit plan listing the audits it intends to conduct during the coming year.  The Internal Audit group presents the plan to the Time Warner Audit & Finance Committee for approval.  In addition to the pre-planned audits approved by the Audit & Finance Committee, Internal Audit on occasion conducts *ad hoc* audits in response to specific requests from the various divisions regarding matters on which Internal Audit has access to expertise or resources not generally available at the divisions. Each month, Internal Audit presents all important internal audit findings to Corporate and divisional leaders in writing in its Internal Audit Monthly Activity Reports.  The Monthly Activity Reports contain summaries of the pre-planned and *ad hoc* internal audits completed during the month, as well as highlights of the more important observations noted by Internal Audit resulting from those audits, and a description of other Internal Audit group activities during the month.  The Monthly Activity Reports generally do not contain summaries or observations from audits that are protected by the attorney-client or work product privileges, though the fact that such audits were conducted might be noted.  The Internal Audit group also keeps a record of any "open" internal audit findings until they are addressed. Internal Audit also updates the Audit & Finance Committee at each in-person meeting of the Committee, and meets in executive session with the Committee (outside the presence of management) at each meeting.

### B.    AOL Audit Confirmation Request Response Procedures

In early 2003, AOL formalized existing procedures requiring that audit confirmation requests received from third parties be forwarded to the AOL Finance department for review.  Under the AOL policy, all requests for audit confirmation must be made, and responded to, in writing.  The decision whether and how to respond is assigned to the AOL Controller's group, which is to act with the advice of

- 11 -

AOL Legal. Before any audit-related response is generated by AOL, the Controller's group coordinates among AOL's Finance, Legal, and business personnel in conducting appropriate due diligence.

<u>Appendix C</u>

"Covered Transactions" are all matters and transactions (other than the PPRO Transactions) involving the counterparties listed in a separate, non-public document entitled "Non-Public List of Counterparties for Appendix C of Agreement Between DOJ and AOL," during the period from July 1, 1999 through April 30, 2002, related to:

(1) advertising and e-commerce revenue at AOL, including delivery of online advertising and impression reporting;

(2) subscriber acquisitions, bundling, counting, and revenue at AOL;

(3) the formation, operation, restructuring, and dissolution of AOL Europe (including transactions involving Goldman Sachs); and

(4) aiding and abetting financial fraud materially affecting the books and records or financial reports of another company.

EXHIBIT  4

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

UNITED STATES OF AMERICA )
)
v. )    CRIMINAL NO. 1:04 M 1133
)
AMERICA ONLINE, INC., )
)
Defendant. )

## ORDER

Upon consideration of the parties' Joint Motion, the Deferred Prosecution Agreement between America Online, Inc. and the United States and the entire record in this matter, it is hereby:

**ORDERED**, that the Joint Motion of the Parties to Hold the Criminal Complaint in Abeyance for Twenty Five Months, is **GRANTED**; and it is hereby further

**ORDERED**, that the criminal complaint against America Online, Inc. shall be held in abeyance for twenty five months from the date of this Order.

Dated: December _13_, 2004

_____
United States Magistrate Judge

## Exhibit 4

EXHIBIT 5



**U.S. Department of Justice**

*United States Attorney*

*Eastern District of Virginia*

*2100 Jamieson Avenue*
*Alexandria, Virginia 22314*
*Tel. (703) 299-3700*
*Fax (703) 299-3981*

December 15, 2004

Richard Cullen, Esquire
McGuireWoods LLP
One James Center
901 East Cary Street
Richmond, VA 23219-4030

      Re:   <u>Time Warner Inc. and America Online, Inc.</u>

Dear Mr. Cullen:

      This letter sets forth the agreement entered into between the United States Attorney's Office for the Eastern District of Virginia and the United States Department of Justice, Criminal Division ("Criminal Division"), collectively referred to as the "Department of Justice," and your client, Time Warner Inc. ("TWI"). TWI warrants and represents that it is authorized to enter into and comply with all provisions of this letter agreement and that the person signing the letter agreement has the authority to bind TWI. The letter agreement between TWI and the Department of Justice is as follows:

      1. TWI accepts responsibility for the conduct of its employees at its wholly-owned subsidiary, America Online, Inc. ("AOL"), in connection with the PPRO Transactions as described in paragraph 2 of the Agreement entered into on this date between AOL and the Department of Justice ("the Agreement").

      2. TWI shall cooperate with the Department of Justice with respect to materials in TWI Corporate's possession, custody, or control to the same extent, and under the same standards, as AOL must do so with respect to materials in AOL's possession, custody, or control under paragraphs 6-8 and 23 of the Agreement. TWI shall also cooperate with the Independent Monitor's examination of AOL's internal controls to the same extent as AOL must do so under paragraph 13 of the Agreement. TWI's public statements shall be subject to paragraphs 12 and 19 of the Agreement to the same extent as those of AOL. TWI shall also adhere to the provisions of paragraph 21 of the Agreement if it sells or merges all or substantially all of AOL's business operations as they exist as of the date of the Agreement.

      3. The question of whether TWI has breached its obligations under this letter agreement shall be determined in the same manner as the question of whether AOL has breached its obligations under the Agreement, as set forth in paragraphs 17-20 of the Agreement. Consistent with paragraph 4 of the Agreement, should the Court decline to approve the Agreement to defer

**Exhibit 5**

prosecution for any reason, this letter agreement between TWI and the Department of Justice shall be null and void, and the parties shall revert to their pre-letter agreement positions.

4. TWI waives its speedy trial rights to the same extent as AOL waives its rights under paragraph 16 of the Agreement.

5. If TWI cooperates as set forth in this letter agreement, and if AOL fulfills its obligations under the Agreement, the Department of Justice and the United States Attorney's Office for the Central District of California shall not prosecute TWI (or any successor or subsidiary) for any conduct relating to the PPRO Transactions (including the conduct described in the complaint filed under paragraph 1 of the Agreement) or any conduct related to the Covered Transactions. This includes any accounting, statements, disclosures, or omissions related to the PPRO Transactions or the Covered Transactions, from July 1, 1999 through the date of this letter agreement. This paragraph does not confer immunity for violations of antitrust, bribery, or tax statutes, rules or regulations.

6. TWI agrees that if it sells or merges all or substantially all of its business operations as they exist as of the date of this letter agreement to or into a single purchaser or group of affiliated purchasers during the term of this letter agreement, it shall include in any contract for sale or merger a provision binding the purchaser/successor to the obligations described in this letter agreement.

7. This letter agreement sets forth all of the terms of the agreement between TWI and the Department of Justice. No modifications or additions to this letter agreement shall be valid unless they are in writing and signed by the Department of Justice, TWI, and a duly authorized representative of TWI. This letter agreement does not confer any rights on any party other than TWI, including any individuals.

If this letter agreement accurately reflects the agreement entered into between the Department of Justice and TWI, please sign the Acknowledgment of Agreement below. Please also have the signatures of the corporate signatories notarized. In addition, please provide a copy of requisite authorization to enter into this letter agreement by TWI's directors. Please return the original of this letter agreement to Paul J. McNulty, United States Attorney for the Eastern District of Virginia.

Sincerely,

Paul J. McNulty
United States Attorney

Joshua R. Hochberg
Chief, Fraud Section
Criminal Division, Department of Justice

## ACKNOWLEDGMENT OF AGREEMENT

## TIME WARNER INC.

I have read this letter agreement and carefully reviewed every part of it with counsel for Time Warner Inc. ("TWI"). I understand the terms of this letter agreement and voluntarily agree, on behalf of TWI, to each of the terms. Before signing this letter agreement, I consulted with the attorney for TWI. The attorney fully advised me of TWI's rights, of possible defenses, and of the consequences of entering into this letter agreement. No promises or inducements have been made other than those contained in this letter agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this letter agreement on behalf of TWI, in any way to enter into this letter agreement. I am also satisfied with the attorney's representation in this matter. I certify that I am an officer of TWI, and that I have been duly authorized by TWI to execute this letter agreement on its behalf.

_____       12/13/04
Richard D. Parsons                    Date
Chairman & Chief Executive Officer
Time Warner Inc.

ADELE PERLITSH
Notary Public, State Of New York
No.01PE4624900
Qualified In Queens County
Commission Expires January 31, 2007

I certify that this letter agreement has been reviewed by duly authorized officials for TWI who understand its terms.

_____       Dec 14, '04
Richard Cullen, Esq.                  Date
McGuireWoods LLP

Attorney for Time Warner Inc.

EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 1:05CR12 |
| | ) | |
| v. | ) | Count 1: Conspiracy |
| | ) | (18 U.S.C. Section 371) |
| 1) CHRISTOPHER J. BENYO, | ) | |
| 2) CHARLES E. JOHNSON, JR. | ) | Counts 2-3: Securities Fraud |
| 3) JOSEPH MICHAEL KENNEDY, | ) | (15 U.S.C. Sections 78j(b) and 78ff; Title 17 |
| 4) JOHN P. TULI, | ) | C.F.R. Sections 240.10b-5) |
| 5) KENT D. WAKEFORD, and | ) | |
| 6) SCOTT E. WIEGAND, | ) | Counts 4-5: False Statements to Auditors |
| | ) | (15 U.S.C. Sections 78m(b)(1) and 78ff; |
| Defendants. | ) | Title 17 C.F.R. Section 240.13b2-2) |

Counts 6-27: Wire Fraud
(18 U.S.C. Sections 1343 and 1346)

Count 28: Obstruction
(18 U.S.C. Section 1512)

Counts 29-31: False Statements
(18 U.S.C. Section 1001)

Forfeiture Notice
(18 U.S.C. Section 981)

Sentencing Factors
(18 U.S.C. Sections 3551 *et seq.*)

January 2005 Term – Alexandria

**INDICTMENT**

1

**Exhibit 6**

THE GRAND JURY CHARGES THAT:

At all times relevant to this Indictment:

## INTRODUCTORY ALLEGATIONS

**I.    RELEVANT PERSONS AND ENTITIES**

**A.    PurchasePro.com**

1.    PurchasePro.com, Inc. ("PurchasePro") was a Nevada corporation headquartered in Las Vegas, Nevada.  Among other things, PurchasePro engaged in the sale of Internet procurement software and services, including "marketplace licenses" designed to enable cost-efficient business-to-business or "B2B" transactions over the Internet.

2.    PurchasePro was an Internet "start-up" company that became publicly owned in or about September 1999 after PurchasePro conducted its initial public offering.  PurchasePro's shares traded on the National Market of the National Association of Securities Dealers Automated Quotations System ("NASDAQ") and were purchased and sold by individuals and entities throughout the United States, including in the Eastern District of Virginia.  As of December 2000, PurchasePro had a total market capitalization that exceeded $1.2 billion based on the number and value of publicly traded stock shares.

3.    On or about September 12, 2002, PurchasePro filed for federal bankruptcy protection.

**B.    AOL and Time Warner**

4.    Prior to January 11, 2001, America Online, Inc. ("AOL") was a Delaware corporation headquartered in Dulles, Virginia in the Eastern District of Virginia.  Among other things, AOL engaged in the sale of Internet subscriptions and advertising and provided interactive services, web brands, Internet technologies, and electronic commerce services.

5.    Time Warner Inc., ("Time Warner") was a Delaware corporation based in New York, New York.  Among other things, Time Warner engaged in the sale of broadcast and print media products.

2

6.      On or about January 11, 2001, AOL and Time Warner merged and began

operating under the name AOL Time Warner Inc.  Following the merger, AOL continued

operating as a separate division and wholly owned subsidiary of the combined company.

7.      Prior to the merger in January 2001, the common stocks of both Time Warner and

AOL were publicly traded on the New York Stock Exchange.  After the merger, the common

stock of Time Warner continued to be publicly traded on the New York Stock Exchange, and

was bought and sold by individuals and entities throughout the United States, including in the

Eastern District of Virginia.   Except where otherwise noted, "AOL" refers herein to both AOL

and AOL Time Warner.

8.      On or about September 13, 2000, AOL launched its Netscape NetBusiness

platform ("NetBusiness"), which was designed to be an Internet site dedicated to providing

interactive services to the small business community.

**C.      PurchasePro Defendants**

9.      Defendant CHARLES E. JOHNSON, JR. (also known as "JUNIOR" JOHNSON)

was Chief Executive Officer and Chairman of the Board of Directors at PurchasePro.  As Chief

Executive Officer, JOHNSON was responsible for all aspects of corporate management at

PurchasePro.  JOHNSON took personal control of PurchasePro's relationship with AOL.

10.     Defendant CHRISTOPHER J. BENYO was Senior Vice President of Marketing

at PurchasePro.  Among other responsibilities, BENYO managed the development of

PurchasePro's products.  BENYO was a member of the senior management team that was

updated, informed and consulted about revenue recognition.

11.     Defendant JOSEPH MICHAEL KENNEDY was Senior Vice President and Chief

Technology Officer at PurchasePro.  Among other responsibilities, KENNEDY managed

PurchasePro's information technologies, a significant business area at an Internet company like

PurchasePro.

12.     Defendant SCOTT E. WIEGAND was Senior Vice President and General

Counsel at PurchasePro.  Among other responsibilities, WIEGAND managed important internal

3

controls at PurchasePro, including approval authority for all PurchasePro contracts, and was one of three senior officers responsible for interacting and communicating with PurchasePro's outside auditors. WIEGAND was a member of the senior management team that was updated, informed and consulted about revenue recognition.

13.    As PurchasePro employees, defendants JOHNSON, BENYO, KENNEDY and WIEGAND each owed a duty to PurchasePro and its shareholders to provide the company with their honest services. Each of the PurchasePro defendants received compensation in the form of salary, bonuses, stock options and other benefits.

### D.    AOL Defendants

14.    Defendant KENT D. WAKEFORD was an Executive Director in Business Affairs at AOL. WAKEFORD worked in AOL's offices in New York, New York. Among other responsibilities, WAKEFORD took day-to-day responsibility for AOL's relationship with PurchasePro.

15.    Defendant JOHN P. TULI was a Vice President in the NetBusiness unit at AOL. TULI was based in AOL's office in Dulles, Virginia. Among other responsibilities, TULI managed the development of the NetBusiness platform of which PurchasePro's marketplace software was a key component.

16.    As AOL employees, WAKEFORD and TULI each owed a duty to AOL and its shareholders to provide the company with their honest services. WAKEFORD and TULI each received compensation in the form of salary, bonuses, stock options and other benefits.

### E.    Additional Co-conspirators

17.    Co-conspirator Jeffrey R. Anderson was Senior Vice President of Sales and Strategic Development at PurchasePro.

18.    Co-conspirator Dale L. Boeth was Senior Vice President of Strategic Development at PurchasePro.

19.    Co-conspirator Robert Geoffrey Layne was Executive Vice President and "co-founder" at PurchasePro.

4

20.    Co-conspirator Shawn P. McGhee was President and Chief Operating Officer at PurchasePro beginning on or about December 2000.

21.    Co-conspirator Scott H. Miller was Senior Vice President of Finance at PurchasePro.

22.    Co-conspirator James S. Sholeff was Vice President at PurchasePro.

23.    Other co-conspirators are known and unknown to the Grand Jury.

## II.    THE FEDERAL SECURITIES LAWS AND SEC RULES AND REGULATIONS

24.    The Federal securities laws and the rules and regulations of the United States Securities and Exchange Commission ("SEC") were designed to ensure that the financial information of publicly traded companies is accurately recorded and disclosed to the investing public.

25.    As a public company, PurchasePro and its officers and employees were required to comply with SEC rules and regulations.  Those regulations protect members of the investing public by, among other things, requiring that a company's financial information is accurately recorded, reviewed by independent auditors and disclosed to the public.  PurchasePro disclosed its financial information to the public and the SEC through various means, including public statements, quarterly conference calls with analysts and investors, and the electronic filing of quarterly reports on SEC Form 10-Q with the EDGAR Management Office of Information and Technology in Alexandria, Virginia in the Eastern District of Virginia.

26.    Under the federal securities laws and SEC rules and regulations, PurchasePro was required, among other things: (a) to make and keep books, records, and accounts that accurately and fairly reflected the company's business transactions; (b) to devise and maintain a system of internal accounting controls that provided reasonable assurances that the company's financial transactions were recorded in a manner that would permit the preparation of financial statements in conformity with Generally Accepted Accounting Principles ("GAAP"); and (c) to file with the Securities and Exchange Commission ("SEC") and disseminate to the investing public quarterly reports (known as SEC Form 10-Q) and other periodic reports that included accurate and reliable

financial statements prepared in accordance with GAAP. In addition, PurchasePro developed, and purported to follow, its own revenue recognition policy that mirrored the requirements of GAAP in all pertinent respects.

27.     PurchasePro also was required to and did retain outside auditors to review, audit and test its financial statements for compliance with appropriate accounting rules. PurchasePro retained the public accounting firm of Arthur Andersen LLP ("Arthur Andersen") as its outside auditors.

28.     Four elements had to be satisfied for PurchasePro to recognize revenue from the sale of a marketplace license. First, there had to be a written, signed contract prior to the end of the quarter. Second, the sale price had to be fixed and determinable, that is, there could not be a future deliverable. Third, the delivery of the product had to occur within that same period. And fourth, collection of payment had to be reasonably assured, that is, the customer had to be credit-worthy. If one or more of these elements was not satisfied, revenue would not be recognized or would be deferred until such time as all four elements were satisfied.

29.     The conspirators knew that Arthur Andersen would not allow revenue to be recognized if a contract was not signed and dated in the quarter, if there was a secret side deal creating a future commitment, concession or obligation or if the customer could not pay for the product.

## III.    AOL AND PURCHASEPRO FORM A STRATEGIC PARTNERSHIP

30.     In or about March 2000, AOL and PurchasePro formed a strategic partnership designed to develop a business-to-business ("B2B") Internet marketplace and to generate significant revenues for both companies.

31.     The conspirators believed and understood that as an Internet start-up company, quarterly revenue was a key factor in determining PurchasePro's success and the price of its stock. The conspirators also knew and understood that revenue was a primary factor on which analysts and investors relied in evaluating the company and making investment decisions.

6

32.     The strategic partnership was memorialized in three different agreements: the Interactive Marketing Agreement ("IMA"), the Technology Development Agreement ("TDA"), and the Warrant Agreement. These agreements obligated PurchasePro to pay AOL a total of $70 million in cash, to issue AOL warrants, which would allow AOL to buy PurchasePro stock in the future at a fixed, split-adjusted price of $63.25 per share, and to allow AOL to receive up to three million additional warrants ("performance warrants") for helping PurchasePro meet certain revenue objectives.

33.     By September 2000, the strategic partnership had failed to generate any revenues for PurchasePro or performance warrants for AOL. Therefore, in or about the last week of September 2000, AOL agreed to give PurchasePro $2 million in revenue by buying ten re-seller marketplace licenses from PurchasePro that AOL did not intend to use or resell.

34.     Subsequently, on or about November 18, 2000, JOHNSON, WAKEFORD and others amended the Warrant Agreement ("Amended Warrant Agreement") to allow AOL to earn up to $30 million worth of warrants in the fourth quarter of 2000, $45 million worth of warrants for the first quarter of 2001 and $60 million worth of warrants for the second quarter of 2001. The Amended Warrant Agreement also:

        a.      removed the revenue thresholds necessary for AOL to earn the performance warrants;

        b.      created a revenue multiplier that gave AOL $3 worth of warrants for each $1 of revenue AOL referred to PurchasePro; and

        c.      reduced the exercise price from $63.25 per share to one penny per share.

35.     JOHNSON, WAKEFORD and others then agreed in or about November 2000, that AOL would purchase approximately $10 million of products directly from PurchasePro and would receive $30 million worth of warrants for the fourth quarter of 2000, which was the maximum allowed under the Amended Warrant Agreement.

36.     Most of the $10 million that was to go to PurchasePro was via a series of new contracts, including:

7

a.       On or about December 21, 2000, AOL purchased five more re-seller marketplace licenses from PurchasePro for $4.6 million, which, like the ten it purchased in September 2000, it did not need and which it intended to give away; and

b.       On or about December 28, 2000, AOL executed a contract giving PurchasePro approximately $4.9 million for subscriptions for AOL's NetBusiness customers for the month of December.

## IV.    PURCHASEPRO'S PUBLIC STATEMENTS AND FILINGS

37.    On or about February 4, 2001, in a response to a critical February *Barrons'* article, JOHNSON publicly stated that PurchasePro's financial statements were prepared in accordance with GAAP and that PurchasePro had no "handshake deals."

38.    On or about February 12, 2001, JOHNSON, WIEGAND, BENYO and others publicly announced on PurchasePro's earnings conference call with analysts and investors that PurchasePro was "raising current consensus revenue estimates for the first quarter 20 percent to more than $42 million."

39.    On or about March 7, 2001, despite the fact that PurchasePro had not made any first quarter marketplace license sales, JOHNSON caused PurchasePro to issue a press release reiterating that revenues were on track to achieve first quarter projections of more than $42 million.

40.    On or about April 26, 2001, JOHNSON, WIEGAND, BENYO and others publicly announced on PurchasePro's earnings conference call that PurchasePro had generated approximately $29.8 million in first quarter revenue.

41.    On May 29, 2001, PurchasePro filed its quarterly report on Form 10-Q for the quarterly period ending March 31, 2001, reporting quarterly revenues totaling approximately $16.02 million.  The Form 10-Q was filed electronically with the EDGAR Management Office of Information and Technology, in Alexandria, Virginia in the Eastern District of Virginia.

# COUNT 1

## (Conspiracy – ALL DEFENDANTS)

THE GRAND JURY FURTHER CHARGES THAT:

**I.   THE CONSPIRACY**

1.   The allegations in paragraphs one through forty-one in the Introductory Allegations section are realleged as if fully set forth herein.

2.   From in or about September 2000 through in or about December 2003, both dates being approximate and inclusive, within the Eastern District of Virginia and elsewhere, the defendants BENYO, JOHNSON, KENNEDY, TULI, WAKEFORD and WIEGAND and others known and unknown to the Grand Jury, unlawfully and knowingly did combine, conspire, confederate and agree together and with each other to commit offenses against the United States, namely:

a.   directly and indirectly, by the use of means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, (1) to use and employ devices, schemes and artifices to defraud; (2) to make untrue statements of material fact and omit to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (3) to engage in acts, practices and courses of business which operated and would operate as a fraud and deceit in connection with the purchase and sale of PurchasePro stock, in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5;

b.   to make and cause to be made materially false statements in PurchasePro's quarterly reports filed with the SEC, in violation of Title 15, United States Code, Sections 78m(a) and 78ff; and Title 17, Code of Federal Regulations, Sections 240.12b-20, 240.13a-13 and 240.13b2-2;

c.   to maintain and cause to be maintained false books and records of PurchasePro, in violation of Title 15, United States Code, Sections 78m(b)(2)(A) and (B), 78m(b)(5), and 78ff; and Title 17, Code of Federal Regulations, Section 240.13b.2-1;

9

     d.    to make and intend to make materially false statements to accountants and auditors of PurchasePro, and conceal material facts from accountants and auditors of PurchasePro, in violation of Title 15, United States Code, Sections 78m(a), 78m(b), and 78ff; and Title 17, Code of Federal Regulations, Section 240.13b2-2; and

     e.    to devise and intend to devise a scheme and artifice to defraud PurchasePro and its shareholders, including to deprive them of the intangible right to honest services of its employees, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Sections 1343 and 1346.

## II.    THE PURPOSES OF THE CONSPIRACY

3.    Among the purposes of the conspiracy were to:

     a.    conceal the true financial condition of PurchasePro by falsely and fraudulently increasing the revenue reported by PurchasePro to its shareholders, the investing public and the SEC, for the benefit of the conspirators;

     b.    conceal the true financial condition of PurchasePro and make it appear to be a successful business-to-business Internet company with increasing revenues;

     c.    falsely and fraudulently increase and maintain the share price of PurchasePro stock; and

     d.    falsely and fraudulently increase the revenue generated for AOL by its Business Affairs and Interactive Marketing units.

## III.    THE MANNER AND MEANS OF THE CONSPIRACY

Defendants BENYO, JOHNSON, KENNEDY, TULI, WAKEFORD and WIEGAND and their co-conspirators employed various manner and means in furtherance of conspiracy and scheme to defraud, including, but not limited to, the following:

10

4.    The conspirators, including BENYO, JOHNSON, KENNEDY, TULI, WAKEFORD and WIEGAND, entered into various transactions and arrangements and used various devices to inflate falsely and fraudulently PurchasePro's publicly announced and reported revenue during the period of the conspiracy.

5.    The devices the conspirators used and attempted to use included:

    a.    using secret, undisclosed side deals;

    b.    forging contracts;

    c.    booking revenue after the quarter closed by using back-dated contracts;

    d.    engaging in revenue swaps based on transactions solely designed to inflate revenue;

    e.    making false and misleading statements to financial personnel and internal and external auditors;

    f.    making false and fraudulent entries in PurchasePro's and AOL's books and records; and

    g.    engaging in related transactions where the link between the transactions was not disclosed.

6.    The conspirators made and caused others to make false and fraudulent entries to PurchasePro's books and records, including accounting records, correspondence, contracts, e-mails and other records used to support and document revenue.

7.    The conspirators made and caused others to make false and fraudulent entries to AOL's books and records, including accounting records, correspondence, contracts, e-mails and other records used to support and document revenue.

8.    The conspirators provided, and caused others to provide, false and misleading information to PurchasePro's outside auditors, by among other things:

    a.    giving the auditors altered and back-dated contracts;

    b.    withholding from the auditors important information, including the terms of secret side deals and oral agreements;

11

      c.     making numerous affirmative misstatements of fact in documents prepared for the auditors;

      d.     failing to maintain accurate documents regarding the signing and completion of contracts and sales agreements; and

      e.     causing AOL to make false confirmations to PurchasePro's auditors.

9.     The conspirators made and caused others to make materially false and misleading public statements about PurchasePro's anticipated revenue and financial performance for upcoming reporting periods knowing that there was a revenue shortfall and that various schemes and devices were used fraudulently to inflate revenue.

10.     The conspirators made and caused others to make press releases, public statements and SEC filings about PurchasePro's financial performance based on fraudulently recorded revenue.

11.     The conspirators and others undertook efforts to conceal their actions, including:

      a.     deleting, attempting to delete, and causing others to delete e-mails;

      b.     destroying and causing others to destroy records and documents;

      c.     creating false and inaccurate documents and e-mails; and

      d.     providing and causing others to provide false and fraudulent testimony and statements to the SEC and the Federal Bureau of Investigation (FBI).

**A.    Fraudulent Devices Used to Inflate PurchasePro's Revenue**

12.     In the first quarter of 2001, JOHNSON, WAKEFORD and others planned to inflate revenue by swapping approximately $45 million in total revenue between PurchasePro and AOL.

13.     On or about March 15, 2001, JOHNSON flew to New York, New York to spend the last few weeks of the first quarter and the first week of April 2001 working in AOL's offices with WAKEFORD and others and attempting to sell marketplace licenses to AOL's customers and partners.

12

14. When they could not sell the marketplace licenses, JOHNSON, WAKEFORD, TULI, BENYO and others made and caused others to make side deals, undocumented guarantees and oral promises to assure purchasers that they would not suffer financially by making a marketplace license purchase from PurchasePro.

15. The side deals included promises by:

   a. AOL to reduce future payments that the marketplace license purchaser was contractually obligated to pay AOL;

   b. AOL and PurchasePro to provide a specified dollar value worth of on-line advertisements or carriage on AOL's Internet properties;

   c. AOL to buy more products from suppliers who purchased a marketplace license and to buy those products at a higher price; and

   d. PurchasePro to buy goods or services from the marketplace license purchasers in the future.

   These side deals were negotiated and agreed to as part of the marketplace license purchases, but were not recorded in the marketplace license contract documentation and were not fully disclosed to PurchasePro's outside auditors and the investing public.

16. During the final weeks of March 2001 and the first week of April 2001, JOHNSON, WAKEFORD, TULI and others made and caused others to make side deals that resulted in marketplace license sales to the following AOL customers and partners: Bigstep, China.com, Cisco, Future Media, Hewlett-Packard, Homestore, Information Markets, InsureZone, Monster, Spherion, Travelocity, Viva Magnetics and Yellowbrix. These marketplace license sales were included in the quarterly revenue numbers PurchasePro submitted to its auditors and reported to the Board of Directors, but the secret side deals, undocumented guarantees and oral promises were not disclosed to PurchasePro's auditors, the investing public and the Board of Directors.

17. During the final weeks of March 2001 and the first week of April 2001, JOHNSON, WIEGAND, KENNEDY and others made and caused others to make side deals that

13

resulted in marketplace license sales to the following PurchasePro customers: Garg Data and Networks Unlimited A.G. ("NUAG"). These marketplace license sales were included in the quarterly revenue numbers PurchasePro submitted to its auditors and reported to the Board of Directors, but the side deals, undocumented guarantees and oral promises were not disclosed to PurchasePro's auditors, the investing public and the Board of Directors.

18.    During the final weeks of March 2001 and the first week of April 2001, JOHNSON, WAKEFORD, BENYO and others offered and caused others to offer secret side deals to Office Depot, Citibank and other major partners of AOL in an effort to induce these AOL partners to buy PurchasePro products and to inflate PurchasePro's revenue.

19.    As of the close of the first quarter of 2001, PurchasePro was well short of meeting the $42 million revenue estimate that had been announced publicly. JOHNSON, WAKEFORD, WIEGAND, TULI, KENNEDY and BENYO and others then created fraudulent arrangements and documentation to inflate artificially PurchasePro's first quarter revenue, including:

a.    attempting to sell additional marketplace licenses after the March 31, 2001 close for inclusion in the first quarter. The conspirators described this as keeping the quarter open;

b.    fraudulently providing PurchasePro with $9 million in revenue through an amendment to the Bulk Subscription Sales Agreement executed after the close of the first quarter but dated as of March 31, 2001; and

c.    creating a fraudulent Statement of Work that would require AOL to pay approximately $3.65 million to PurchasePro for technical integration work that was not completed by PurchasePro in the first quarter.

20.    As of part of this arrangement to inflate PurchasePro's first quarter revenue, AOL was to receive benefits from PurchasePro, including the following:

a.    approximately $12.2 million for commissions in the first quarter that AOL had not fully earned;

14

b.  approximately $7.7 million worth of warrants for a referral AOL did not make; and

c.  approximately $5 million for television advertising on CNN and other AOL media that PurchasePro did not want.

### Keeping the Quarter Open

21.  On or about March 31, 2001, JOHNSON delivered to WAKEFORD a handwritten $12.2 million check as payment for commissions allegedly earned by AOL from the first quarter 2001 marketplace license sales campaign.  In fact, JOHNSON, WAKEFORD and others knew that AOL had not earned the full $12.2 million in commissions by the close of the first quarter, but had earned only about $6.7 million in commission and much of that was from marketplace licenses sold only by means of undocumented and undisclosed side deals. JOHNSON, WAKEFORD and others planned on selling enough additional marketplace licenses while keeping the quarter open in the first week of April 2001 to justify, after the fact, the full $12.2 million in commissions.

22.  While keeping the quarter open during the first week of April 2001, JOHNSON, WAKEFORD and others negotiated and attempted to negotiate marketplace license sales with at least four companies, including 1800-Flowers, Proxicom, Monster and China.com, for inclusion as first quarter sales.

23.  In order to disguise these efforts to sell marketplace licenses after the close of the quarter, JOHNSON, WAKEFORD and others assisted in back-dating the contracts and facsimile headers to make it appear that the contracts were signed by the close of the first quarter of 2001. These efforts resulted in at least two additional marketplace license sales after March 31, 2001, with a total value of approximately $6.7 million, being recorded by PurchasePro as revenues in the first quarter of 2001.

24.  Between on or about April 19, 2001 and April 23, 2001, JOHNSON and others forged and caused to be forged two letters purportedly from AOL reducing the commission rate PurchasePro owed AOL.

### The $9 Million Bulk Subscriptions Amendment

25.    In or about the first days of April 2001, JOHNSON threatened to stop payment on the $12.2 million check unless WAKEFORD and others at AOL agreed to execute the $9 million Amended Bulk Subscriptions Agreement, which was necessary for PurchasePro to reach its $42 million quarterly revenue projection. On or about April 5, 2001, JOHNSON, WAKEFORD and others caused AOL to execute the $9 million amendment.

### The AuctioNet Statement of Work

26.    In or about the last days of March 2001 and early April 2001, JOHNSON, WAKEFORD, WIEGAND, TULI, KENNEDY and BENYO created and caused others to create a fraudulent $3.65 million contract known as the AuctioNet Statement of Work.

27.    The AuctioNet Statement of Work required AOL to pay PurchasePro approximately $3.65 million for integration work allegedly performed by PurchasePro in the first quarter of 2001. JOHNSON, WAKEFORD, WIEGAND, TULI, KENNEDY and BENYO knew that the work necessary to support AOL's payment of approximately $3.65 million had not been completed in the first quarter of 2001 and that PurchasePro employees were still drafting the Statement of Work, which defined the work necessary for the integration and the $3.65 million payment, after the close of the first quarter and during the first week of April 2001. Nevertheless, the conspirators fraudulently back-dated and caused the Statement of Work to be back-dated to February 5, 2001 to give the false appearances that the integration project had been ongoing for nearly two months, when it had not.

28.    The conspirators and others falsely and fraudulently represented and demonstrated to PurchasePro's outside auditors that PurchasePro had completed the full integration work by March 31, 2001, in that:

    a.    KENNEDY and BENYO created and caused others to create an Internet link to support the false and fraudulent representation to PurchasePro's outside auditors that PurchasePro had completed the full integration work called for by the Statement of Work by March 31, 2001; and

16

      b.     WAKEFORD, TULI and others made and caused others to make false confirmations to PurchasePro's outside auditors that the work under the Statement of Work had been completed by PurchasePro and accepted by AOL as of March 31, 2001.

29.     The conspirators utilized the fraudulent AuctioNet Statement of Work, for which the AOL signature had been cut-and-pasted, as part of the scheme to deceive the auditors in April 2001.

30.     Based on these fraudulent arrangements, the conspirators and others falsely told and caused others to tell PurchasePro's outside auditors and Board of Directors that PurchasePro had met its first quarter 2001 revenue target of $42 million.

**B.    PurchasePro's Public Statements**

31.     On April 26, 2001, after PurchasePro's auditors discovered and rejected some of the fraudulent revenue, JOHNSON, WIEGAND, BENYO and others publicly announced that PurchasePro had generated approximately $29.8 million in first quarter revenue.  The $9 million for the back-dated Bulk Subscriptions Agreement, the $3.65 million for the fraudulent and back-dated Statement of Work and millions for marketplace license sales with secret side deals and back-dated documents were included in the $29.8 million revenue figure.

32.     On May 29, 2001, after PurchasePro's auditors discovered and rejected additional fraudulent revenue including fraudulent revenue that was included in the April 26th announcement, PurchasePro filed its quarterly SEC report on Form 10-Q for the quarterly period ending March 31, 2001, reporting quarterly revenues totaling approximately $16.02 million.  The Form 10-Q still included revenue for marketplace license sales with secret side deals and back-dated documents.

**C.    Payments to the Defendants**

33.     In early April 2001, WIEGAND and others caused PurchasePro to make the payments to JOHNSON, WIEGAND, BENYO, KENNEDY and others.

17

34.    On or about April 10, 2001, JOHNSON, WIEGAND and others caused the PurchasePro Board of Directors to approve, among others, stock option grants for WIEGAND, BENYO, KENNEDY and others.

## IV.    OVERT ACTS

In furtherance of the conspiracy and to effect its illegal objects, on or about the dates listed below, in the Eastern District of Virginia and elsewhere, defendants BENYO, JOHNSON, KENNEDY, TULI, WAKEFORD and WIEGAND, and their co-conspirators, Anderson, Boeth, Layne, McGhee, Miller, Sholeff, and others known and unknown to the Grand Jury, committed and caused to be committed the following overt acts, among others:

35.    On or about December 21, 2000, JOHNSON, WAKEFORD, WIEGAND and others caused a letter to be sent from PurchasePro to AOL falsely stating that AOL had earned PurchasePro warrants worth $30 million.

36.    Between in or about the end of December 2000 and early January 2001, WAKEFORD and others told AuctioNet that AOL would participate in a roundtrip deal among AOL, PurchasePro and AuctioNet but that the written agreement between AOL and AuctioNet could not be executed until January 2001 in order to conceal the linkage between the deals.

37.    On or about February 12, 2001, JOHNSON and others falsely stated to Arthur Andersen, among other things, that "[t]here has been no . . . [f]raud involving management" and that all "side agreements" had been properly disclosed.

### First Quarter 2001 Marketplace License Sales Campaign

38.    On or about March 15, 2001, JOHNSON traveled to AOL's office in New York, New York in order to work with WAKEFORD and other AOL employees to sell PurchasePro products, including marketplace licenses.

39.    On or about March 29, 2001, JOHNSON sent an e-mail to WAKEFORD stating that "free" marketplace licenses should not be that difficult to sell.

18

*Bigstep*

40.     On or about March 31, 2001, TULI, WAKEFORD and others caused Bigstep to execute a Marketplace Software License Agreement with PurchasePro for $1.1 million and dated the agreement March 29, 2001.

41.     On or about April 2, 2001, TULI sent an e-mail regarding AOL's oral promise to restructure the payments Bigstep owed to AOL in exchange for Bigstep's purchase of a marketplace license from PurchasePro and stated: "Please delete after you take a look. No written agreement was ever consummated."

42.     On or about April 19, 2001, TULI sent an e-mail to WAKEFORD and others confirming that "we promised to have the deal changed within 3 weeks of the term ending."

*Cisco*

43.     On or about March 22, 2001, WAKEFORD and others caused AOL to discount by $440,000 the $5 million in advertising bought by Cisco so that Cisco could purchase a marketplace license from PurchasePro for $440,000.

44.     On or about March 28, 2001, WAKEFORD and others caused Cisco to execute a Marketplace Software License Agreement with PurchasePro for $440,000.

*Citibank*

45.     Between on or about March 28, 2001 and April 2, 2001, WAKEFORD and others tried to induce Citibank to purchase a PurchasePro marketplace license for approximately $3.7 million for which AOL and PurchasePro would provide Citibank approximately twice that amount in debt forgiveness, Internet advertising and other benefits.

*Future Media*

46.     On or about March 26, 2001, WAKEFORD and others orally promised Future Media that AOL would buy more products from Future Media at higher prices if Future Media purchased a marketplace license from PurchasePro. WAKEFORD and others refused to put AOL's promise to Future Media in writing.

19

47.     On or about March 30, 2001, WAKEFORD and others caused Future Media to execute a Marketplace Software License Agreement with PurchasePro for $1 million.

### Hewlett-Packard

48.     On or about March 27, 2001, Anderson and others caused Hewlett-Packard to execute a Marketplace Software License Agreement with PurchasePro for $187, 000.

### Homestore

49.     On or about March 20, 2001, an AOL co-conspirator and others promised Homestore that AOL would shift advertising to reimburse Homestore if it purchased a PurchasePro marketplace license.

50.     On or about March 26, 2001, an AOL co-conspirator and others caused Homestore to execute a Marketplace Software License Agreement with PurchasePro for $3.7 million.

### Information Markets

51.     On or about March 26, 2001, WAKEFORD and others caused AOL to discount by $100,000 the $1 million in advertising bought by Information Markets so that Information Markets could purchase a $100,000 marketplace license from PurchasePro.

52.     On or about March 29, 2001, WAKEFORD and others caused Information Markets to execute a Marketplace Software License Agreement with PurchasePro for $100,000.

### InsureZone

53.     On or about March 30, 2001, Anderson and others, with WIEGAND's knowledge, reduced InsureZone's existing payment obligations to PurchasePro by $180,000 so that InsureZone could purchase a marketplace license for $180,000.

54.     On or about March 30, 2001, a PurchasePro employee caused InsureZone to execute a Marketplace Software License Agreement with PurchasePro for $180,000.

### NUAG

55.     On or about March 30, 2001, WIEGAND, KENNEDY and others caused NUAG to execute a Marketplace Software License Agreement (International Edition) with PurchasePro

20

for $3.7 million in exchange for an oral promise by PurchasePro to purchase $4.2 million of NUAG products in the second quarter of 2001.

56.    In or about late March or early April 2001, WIEGAND and others executed and caused to be executed an internal sales representation letter that falsely represented that there were no unidentified oral agreements or other written agreements related to the signed software license agreement with NUAG.

57.    On or about April 9, 2001, WIEGAND, KENNEDY and others caused PurchasePro to enter into a Letter of Intent that required PurchasePro to pay NUAG approximately $4.2 million for NUAG products in the second quarter of 2001.

### *Office Depot*

58.    On or about March 30, 2001, JOHNSON, WAKEFORD, BENYO and others asked Office Depot to purchase approximately $9.8 million in bulk subscriptions from PurchasePro in exchange for which AOL and PurchasePro would provide Office Depot with approximately three times that amount in debt forgiveness, advertising and other benefits.

59.    On or about March 30, 2001, JOHNSON, WAKEFORD, BENYO and others requested that Office Depot back-date the proposed bulk subscriptions agreement to avoid the suspicion of PurchasePro's auditors.

### *Spherion*

60.    On or about March 23, 2001, WAKEFORD and others promised that AOL would increase its purchase of Spherion services by at least $30 million over the next year and spend at least $100 million on Spherion services over the next eighteen months if Spherion bought a PurchasePro marketplace license.

61.    On or about March 28, 2001, WAKEFORD and others caused Spherion to execute a Marketplace Software License Agreement with PurchasePro for $1.1 million.

21

*Travelocity*

62.    On or about March 21, 2001, WAKEFORD and others orally promised that AOL would help Travelocity recoup its costs if Travelocity bought a PurchasePro marketplace license. WAKEFORD refused to put his promise to Travelocity in writing.

63.    On or about March 30, 2001, WAKEFORD and others caused Travelocity to execute a Marketplace Software License Agreement with PurchasePro for $1 million.

*Viva Magnetics*

64.    On or about March 28, 2001, WAKEFORD and others caused Viva Magnetics to executed a Marketplace Software License Agreement with PurchasePro for $440,000.

*Yellowbrix*

65.    On or about March 29, 2001, WAKEFORD, TULI and others agreed that AOL would provide payment relief or otherwise restructure an existing agreement between AOL and Yellowbrix if Yellowbrix bought a PurchasePro marketplace license.

66.    On or about March 30, 2001, WAKEFORD criticized a subordinate for putting AOL's promise to restructure the Yellowbrix agreement in writing.

67.    On or about March 31, 2001, WAKEFORD, TULI and others caused YellowBrix to execute a Marketplace Software License Agreement with PurchasePro for $440,000.

**Keeping the Quarter Open**

68.    In or about early April 2001, JOHNSON stated that the quarter ends when I say it ends, not when the calendar says it ends.

69.    On or about April 1, 2001, JOHNSON sent an e-mail that stated: "Now I can't sleep until my [quarter] is done – I have banked my future on you big guy!!  I trust you and would have waited to pay these commissions if it wasn't for my trust in you…. We need Flowers [i.e. 1-800-Flowers], Monster and 1.5 more deals and I need the paperwork for the quarter sent no later than Wednesday … PurchasePro and my entire financial future does depend on this, in other words I will be wiped out otherwise."

22

70.    On or about April 1, 2001, WAKEFORD sent an e-mail discussing "Deals to Get" and assigning sales teams to close marketplace license sales to 1-800-Flowers, Monster, Proxicom and approximately five other businesses.

71.    On or about April 2, 2001, Anderson sent JOHNSON an e-mail showing that PurchasePro needed at least an additional $7.4 million in AOL referrals in order to make its first quarter revenue projections.

72.    On or about April 4, 2001, JOHNSON sent an e-mail to a senior AOL officer that stated: "Thanks – getting tons of heat and need your help.  I could be buried and I mean buried without your help – thanks, without you I have no idea what I would do – my entire business life I have never felt this helpless or desperate ... I have early meeting with our auditors so any info will be helpful – I will have to give them the remainder of contracts completed in Q1 so I need all AOL docs early please.  Your friend, Jr."

73.    On or about April 6, 2001, a PurchasePro employee sent WIEGAND and others an e-mail listing five contracts for which PurchasePro was still awaiting documentation, including 1-800-Flowers, China.com and Monster.

### 1-800-Flowers

74.    On or about April 2, 2001, WAKEFORD and others offered 1-800-Flowers advertising worth $5 million if 1-800-Flowers purchased a marketplace license for $3.7 million.

### China.com

75.    On or about April 2, 2001, WAKEFORD and others caused AOL and China.com to execute an agreement to reduce by $4 million monies owed by China.com to AOL for advertising in exchange for China.com agreeing to purchase a marketplace license from PurchasePro for approximately $3.7 million.

76.    On or about April 4, 2001, JOHNSON, WAKEFORD and others caused China.com to execute a Marketplace Software License Agreement with PurchasePro for $3.7 million and caused it to be back-dated to March 30, 2001.

23

*Garg Data*

77.     In or about the first week of April 2001, JOHNSON and others caused Garg Data to execute an undated Marketplace Software License Agreement with PurchasePro for $3.5 million.

78.     Between on or about April 4, 2001 and on or about April 10, 2001, KENNEDY and others caused PurchasePro to enter into agreements with Sagence Systems, a company related to Garg Data, that required PurchasePro to pay Sagence Systems a total of approximately $8.5 million, with $4 million paid immediately.

*Monster*

79.     On or about April 4, 2001, WAKEFORD sent by e-mail to Monster an irrevocable letter from PurchasePro to AOL reallocating approximately $6.2 million of advertising inventory from AOL to Monster.

80.     On or about April 6, 2001, JOHNSON, WAKEFORD and others caused Monster to execute a Marketplace Software License Agreement with PurchasePro for $3 million and caused the agreement to be back-dated to March 31, 2001.

*Proxicom*

81.     On or about April 4, 2001, WAKEFORD, JOHNSON and others tried to induce Proxicom, a company located in Reston, Virginia, to purchase a $3.7 million PurchasePro marketplace license by verbally promising that AOL would buy back the $3.7 million marketplace license if Proxicom was unable to sell it. WAKEFORD refused to put his promise to Proxicom in writing.

**First Quarter 2001 Warrants**

82.     On or about March 28, 2001, JOHNSON, WAKEFORD and others agreed that PurchasePro, not AOL, would provide the revenue necessary for AOL to earn the first quarter 2001 performance warrants.

83.    On or about March 30, 2001, JOHNSON executed a letter to AOL falsely stating that AOL had earned 1,123,828 performance warrants, which were worth approximately $7.7 million.

**The Statement of Work**

84.    On or about March 30, 2001, WAKEFORD sent an e-mail to Layne attaching a document to help Layne create the AuctioNet Statement of Work.

85.    On or about March 30, 2001, BENYO directed a PurchasePro employee to send a false e-mail regarding the status of the AuctioNet integration project.

86.    On or about March 31, 2001, TULI sent an e-mail, which was forwarded to WIEGAND, that attached language for the Statement of Work.

87.    On or about March 31, 2001, WIEGAND instructed a PurchasePro employee to prepare the AuctioNet Statement of Work.

88.    On or about March 31, 2001, BENYO sent an e-mail stating that further work would need to be done on April 1, 2001 to draft the Statement of Work.

89.    On or about April 2, 2001, multiple employees from PurchasePro's technology group met to discuss the work that needed to be done to integrate quickly AuctioNet's auction functionality on to NetBusiness.

90.    On or about April 2, 2001, BENYO, KENNEDY and others agreed that because PurchasePro did not complete full integration of AuctioNet's auction functionality on to NetBusiness by the end of the first quarter 2001, BENYO and his subordinates should create an Internet link between NetBusiness and AuctioNet's website and then try to finish the integration work before Arthur Andersen arrived for its quarterly review.

91.    On or about April 4, 2001, BENYO, KENNEDY and others caused an Internet link from NetBusiness to AuctioNet to be launched.

92.    On or about April 5, 2001, BENYO and others finalized the AuctioNet Statement of Work and caused it to be dated "February 5, 2001."

93.     Between on or about April 7, 2001 and on or about April 10, 2001, KENNEDY executed the AuctioNet Statement of Work dated "February 5, 2001."

94.     On or about April 7, 2001, JOHNSON directed others to cut and paste the signature of an AOL officer on the AuctioNet Statement of Work dated "February 5, 2001."

95.     In or about mid-April 2001, JOHNSON, WIEGAND, KENNEDY, BENYO and others caused PurchasePro to submit the fraudulent and back-dated AuctioNet Statement of Work to Arthur Andersen in order to recognize approximately $3.65 million in revenue for the first quarter of 2001.

96.     On or about April 20, 2001, a PurchasePro employee, with BENYO's knowledge, demonstrated the Internet link from NetBusiness to AuctioNet for Arthur Andersen in an effort to mislead the auditors.

97.     On or about April 20, 2001, WIEGAND caused a confirmation letter to Arthur Andersen for the AuctioNet Statement of Work to be forwarded to AOL.

98.     On or about April 20, 2001, BENYO and others caused a PurchasePro employee to e-mail an electronic version of the Statement of Work and acceptance documents to TULI.

99.     On or about April 20, 2001, TULI executed a confirmation letter on behalf of AOL to PurchasePro's auditors that falsely stated, among other things, "all work covered under the Statement of Work dated February 5, 2001 was completed and accepted as of March 30, 2001."

100.    On or about April 20, 2001, WAKEFORD faxed TULI's confirmation letter to PurchasePro.

101.    On or about April 24, 2001, WIEGAND sent an e-mail containing questions WIEGAND anticipated Arthur Andersen would ask TULI during a telephone conference call about the AuctioNet Statement of Work.

102.    On or about April 24, 2001, Layne sent TULI and WAKEFORD an e-mail that included the answers TULI should give in order to deceive Arthur Andersen about the completion of the AuctioNet integration in the first quarter.

26

103.    On or about April 24, 2001, TULI falsely stated in a telephone conference call with Arthur Andersen that the integration work under the AuctioNet Statement of Work had been completed by March 31, 2001.

104.    On or about April 24, 2001, Miller, with the assistance of KENNEDY and knowledge of WIEGAND, sent a memorandum to Arthur Andersen supporting the $3.65 million in first quarter 2001 revenue resulting from the AuctioNet Statement of Work.

**$12.2 Million Check**

105.    On or about March 30, 2001, JOHNSON caused multiple blank, pre-signed PurchasePro checks to be sent to himself in New York, New York.

106.    On or about March 31, 2001, JOHNSON gave WAKEFORD and others at AOL a PurchasePro check, number 014808, in the amount of $12.2 million, dated "March 30, 2001" and containing the handwritten notation "3/30/01 AOL $12,200,000 Commissions" on the check register.

107.    On or about March 31, 2001, JOHNSON took back the $12.2 million check.

108.    On or about March 31, 2001, WAKEFORD sent JOHNSON an e-mail stating that a senior AOL officer "says that he is knee deep in blood and you are [expletive] on his head – [he's] been on the phone screaming on your behalf.  He's flying in tomorrow and coming straight to your hotel – as he says, you better tell him your hotel room or he will knock on [expletive] every door."

109.    On or about March 31, 2001, JOHNSON sent an e-mail to WAKEFORD that stated:

> Kent, I have pd or enabled AOL to recognize 120+ million dollars and dedicated myself and Jeff Anderson 100% to AOL in Q1 and now the rules are changing and I am left holding the bag – so far this has been a one-sided relationship and now PPRO will be crushed and it will personally cause my world to collapse and my family – I bet on AOL to deliver and because nobody had urgency except for the 11th hour PPRO and my world will hurt while AOL has collected a fortune from us and been give[n] 'everything' that I have and yet here I am on the eve of my life being decimated – we have not been paid a single penny on those deals yet again ol' PPRO and Jr should jump through hoops and give AOL money so they can support their quarter while you'll want to talk to me

about spinning a story for the street—the story here is that I pd you tons of money created revenue with my own sells last quarter and gave away 6% of a company I have dedicated every dollar and every second for 5 years without being pd a dime—I expect AOL to step up to the plate and deliver for me like I have every time I have been asked including another 5-million in TW only 1-month ago – I have spent 16 hour days with you and watch the apathy that got us here and ther [sic] has been lots of talk and very little walk. . . . Bottom line is that if we miss everything ultimately will hit the fan because of the significance of warrants, dollars, and the awareness of analysts and media. . . . I pray this can be resolved because I enjoy the relationship and that is why I sold my soul. Jr.

110.    On or about March 31, 2001, JOHNSON gave the $12.2. million check, number 014808, back to WAKEFORD and others.

111.    On or about April 1, 2001, WAKEFORD caused a photocopy of the $12.2 million check and check register to be sent by facsimile from New York, New York to AOL finance personnel in Dulles, Virginia.

112.    On or about April 2, 2001, JOHNSON sent an e-mail to WAKEFORD that stated: "Again it appears the urgency to get me the contracts hasn't happened. I am prepared to unwind the entire Q1 transaction including the following: Warrants delivered but not earned, [c]arriage not delivered, product development not delivered and the T/W ads that we did not want a[nd] did as a favor – commission check for 12.2 million is inaccurate and should reflect a number substantially less including us being re-imbursed for Q4 and Q1 deals which will total about 12.7 million and then we will give you the appropriate commission 6.6 which will result in a net to PPRO of 6.1 – we did deliver the services for the pre-paid subs and expect payment … this is ugly for one reason and that is AOL didn't deliver their end of the deal."

113.    On or about April 2, 2001, JOHNSON sent an e-mail to WAKEFORD that stated: "I expect to have 12.8 [million] in revenue – or lower commissions, no exceptions by tomorrow afternoon no no excuses – every option will be reviewed – no joke I did stop payment today, however I will write you another check tomorrow. Jr."

114.    On or about April 3, 2001, JOHNSON gave WAKEFORD and others at AOL a new PurchasePro check, number 014809, in the amount of $12.2 million and dated "30 March 01."

28

115.    On or about April 5, 2001, a co-conspirator at AOL executed and delivered to PurchasePro a letter that stated: "We are in receipt of your commission check for $12,2000,000. We have received referral letters with respect to $6,700,000 of commissions earned. You have assured us that we have earned a total of $12,200,000 in commissions and paid us accordingly. We look forward to receiving the documentation confirming the additional marketplace sales on which AOL has earned the remaining commissions as soon as possible."

116.    On or about April 19, 2001, JOHNSON directed others to cut and paste the signature of a senior AOL officer on a letter purportedly from AOL to PurchasePro concerning application of PurchasePro's $12.2 million payment.

117.    On or about April 23, 2001, JOHNSON directed others to cut and paste the signature of a senior AOL officer on a letter purportedly from AOL to PurchasePro confirming the commission rate and listing total first quarter referral revenue as "$17,324,000."

**First Quarter 2001 Bulk Subscriptions**

118.    On or about March 31, 2001, JOHNSON sent an e-mail to WAKEFORD, and forwarded it to WIEGAND and others, stating that "This Quarter AOL will recognize 6-7 from impressions 2-3 from development, 3 from T/W adv plus 7.7 b/s and 6+ commissions --- if you do the math that somewhere between 25-27 million and that is all from us and AOL can't figure out if they will fund 9.8 for pre-pds that we have loaded and marketed to because of a rev set-off-----we are asking for 14 from your partners and only 9.8 from AOL===EASY calculation is you got 27-9.8=17.2net from PPRO and PPRO gets partner net of 14 out of a gross 20 and subs for 9.8 and the total is 23.8 and from AOL directly 9.8—Kent, I am not sure of AOL's barrier of fairness but I am having difficult understanding why the trouble delivering on a promise—I am having trouble comprehending the hesitation."

119.    On or about March 31, 2001, JOHNSON sent an e-mail to a co-conspirator at AOL threatening to hold the $12.2 million check until AOL signed the bulk subscriptions agreement.

29

120.    On or about April 5, 2001, a co-conspirator at AOL executed an approximately $9 million Amended Bulk Subscription Agreement dated "as of March 31, 2001."

121.    On or about April 18, 2001, TULI sent an e-mail discussing the $9 million bulk subscription agreement that stated: "This is the scoop. During the week of 4/5 Wakeford and Junior and [a co-conspirator at AOL] had to make Junior whole to help him make his numbers. [$]9M[illion] in subscriptions was something Wakeford and [the co-conspirator] put together because we couldn't sell enough marketplaces despite best efforts. I was in on most deals, the marketplace sale was really tough in this market. The justification was not …mine. [Business Affairs] put together an e-mail to justify the expense. It was clear that [the AOL CFO] would have an issue with this approach the email he received basically said that NetB thought we could get 11% click thru on Marketplace subscriptions. Not very convincing. [The AOL CFO] has good questions about Jan/Feb vs. March and we will have to build a legitimate answer. We are reacting to the BA sales effort. That is how this came about."

### Representations to PurchasePro's Outside Auditors

122.    In or about mid-April 2001, JOHNSON, WIEGAND and others caused PurchasePro to submit preliminary revenue numbers for the first quarter 2001 to Arthur Andersen that sought recognition of approximately $42 million in revenue.

### Public Statements

123.    On or about February 12, 2001, JOHNSON, WIEGAND, BENYO and others caused PurchasePro to issue a press release that stated: "PurchasePro expects first quarter revenue of more than $42 million, a 25 percent quarter-over-quarter increase."

124.    On or about March 7, 2001, JOHNSON and others caused PurchasePro to issue a public statement that revenues were on track to achieve expected first quarter revenue in excess of $42 million.

125.    On or about April 26, 2001, JOHNSON, WIEGAND, BENYO and others caused PurchasePro to issue a press release announcing that it earned approximately $29.8 million in revenue for the quarter ending March 31, 2001.

126.    On or about April 26, 2001, JOHNSON, WIEGAND, BENYO and others conducted a public conference call with securities analysts and others in which PurchasePro announced revenue of approximately $29.8 million for the quarter ended March 31, 2001.

127.    On or about May 29, 2001, JOHNSON, WIEGAND and others caused PurchasePro to file a Form 10-Q with the SEC's EDGAR Management Office of Information Technology for the quarter ending March 31, 2001, which stated that PurchasePro had revenues of approximately $16 million.

**Efforts to Conceal the Fraud**

128.    In or about mid-April 2001, JOHNSON directed a subordinate at PurchasePro to delete e-mails to and from AOL from JOHNSON and others relating to the first quarter of 2001.

129.    In or about mid-April 2001, WIEGAND directed a subordinate at PurchasePro to delete WIEGAND'S e-mails relating to the first quarter of 2001.

130.    In or about early May 2001, JOHNSON directed a subordinate to destroy PurchasePro documents relating to AOL.

131.    On or about February 14, 2002, WAKEFORD made false statements under oath before the SEC about his involvement in the scheme.

132.    On or about March 12 and 13, 2002, JOHNSON made false statements under oath before the SEC about his involvement in the scheme.

133.    On or about April 10, 2002, TULI made false statements under oath before the SEC about his involvement in the scheme.

134.    On or about April 10, 2002, KENNEDY made false statements under oath before the SEC about his involvement in the scheme.

135.    On or about June 11, 2003, KENNEDY made false statements to the FBI about his involvement in the scheme.

136.    On or about November 24, 2003, WIEGAND made false statements to the FBI about his involvement in the scheme.

**Retention Payments**

137.    On or about April 5, 2001, JOHNSON, WIEGAND and others caused PurchasePro to pay "retention bonuses" to the following people in the following amounts:

        a.    JOHNSON -- $2 million;

        b.    WIEGAND -- $100,000;

        c.    KENNEDY -- $100,000;

        d.    BENYO -- $100,000.

138.    On or about April 10, 2001, JOHNSON, WIEGAND and others caused PurchasePro to grant stock options to the following people in the following amounts:

        a.    BENYO -- 75,000;

        b.    KENNEDY -- 50,000;

        c.    WIEGAND -- 25,000.

        (All in violation of Title 18, United States Code, Section 371)

## COUNT TWO

(Securities Fraud: Issuing False Press Release – ALL DEFENDANTS)

THE GRAND JURY FURTHER CHARGES THAT:

1.      The allegations contained in paragraphs one through forty-one of the Introductory Allegations and paragraphs three through one hundred thirty-eight of Count One of this Indictment are repeated and realleged as if fully set forth herein.

2.      On or about April 26, 2001, within the Eastern District of Virginia and elsewhere, defendants BENYO, JOHNSON, KENNEDY, TULI, WAKEFORD, WIEGAND and others did knowingly and willfully, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges: (a) employ devices, schemes and artifices to defraud; (b) make and cause others to make untrue statements of material fact and omit and cause others to omit to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engage in acts, practices and courses of business which operated and would operate as a fraud and deceit upon purchasers and sellers of PurchasePro securities, to wit, causing PurchasePro to issue a false and misleading press release announcing the financial results for its fiscal quarter ending March 31, 2001.  Specifically, the defendants caused PurchasePro to:  (i) include revenue in the financial results reported in the press release that was based on back-dated and forged contracts; (ii) include revenue in the financial results reported in the press release that was based on marketplace license sales resulting from undisclosed secret side deals; (iii) omit to state in the press release that the secret side deals had not been disclosed to PurchasePro's outside auditors; and (iv) omit to state in the press release that fraudulent revenue-related entries were made at the direction of management.

(All in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; Title 18, United States Code, Section 2)

## COUNT THREE

(Securities Fraud:  Filing False SEC Form 10-Q – ALL DEFENDANTS)

THE GRAND JURY FURTHER CHARGES THAT:

1.      The allegations contained in paragraphs one through forty-one of the Introductory Allegations and paragraphs three through one hundred thirty-eight of Count One of this Indictment are repeated and realleged as if fully set forth herein.

2.      On or about May 29, 2001, within the Eastern District of Virginia and elsewhere, defendants JOHNSON, WAKEFORD, WIEGAND and TULI, aided and abetted by each other and others, did knowingly and willfully, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges: (a) employ devices, schemes and artifices to defraud; (b) make untrue statements of material fact and omit to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, in reports and documents required to filed with the SEC under the Securities Exchange Act of 1934 and rules and regulations promulgated thereunder; and (c) engage in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon purchasers of PurchasePro securities, to wit, causing PurchasePro to prepare and file with the SEC an SEC Form 10-Q, which reported falsely and fraudulently inflated financial results for the quarter ending March 31, 2001.  Specifically, the defendants caused PurchasePro to: (i) include in the filed financial results revenue that was based on back-dated, forged and fraudulent documents; (ii) include in the filed financial results revenue that was recorded based on marketplace license sales resulting from undisclosed secret side deals; (iii) omit to state in its filing that secret side deals had not been disclosed to PurchasePro's outside auditors; and (iv) omit to disclose that fraudulent revenue-related entries were made at the direction of management.

(All in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2)

34

## COUNT FOUR

(False Statements to Auditors -- JOHNSON, WAKEFORD, WIEGAND and TULI)

THE GRAND JURY FURTHER CHARGES THAT:

1.      The allegations contained in paragraphs one through forty-one of the Introductory Allegations and paragraphs three through one hundred thirty-eight of Count One of this Indictment are repeated and realleged as if fully set forth herein.

2.      In or about April 2001, in the Eastern District of Virginia and elsewhere, defendants JOHNSON, WAKEFORD, WIEGAND and TULI unlawfully, willfully and knowingly, directly and indirectly, (a) made and caused to be made materially false and misleading statements and (b) omitted to state, and caused others to omit to state, material facts necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading to the outside auditors of PurchasePro, an issuer of a class of securities registered pursuant to Section 12 of the Securities Exchange Act of 1934, in connection with examination and review of the financial statements of PurchasePro as required by law to be made, and preparation and filing of a document and report required to be filed with the SEC pursuant to the rules and regulations enacted by the SEC.

3.      Specifically, JOHNSON, WAKEFORD, WIEGAND and TULI stated and caused others to state that all of the work covered under the Statement of Work dated February 5, 2001, was completed and accepted by AOL as of March 31, 2001, when, in fact, they knew it was not.

(All in violation of Title 15, United States Code, Sections 78ff, 78m(a) and 78m(b); Title 17, Code of Federal Regulations, Section 240.13b2-2; and Title 18, United States Code, Section 2.)

## COUNT FIVE

(False Statements to Auditors – JOHNSON, WAKEFORD, WIEGAND and TULI)

THE GRAND JURY FURTHER CHARGES THAT:

1.      The allegations contained in paragraphs one through forty-one of the Introductory Allegations and paragraphs three through one hundred thirty-eight of Count One of this Indictment are repeated and realleged as if fully set forth herein.

2.      In or about April 2001, in the Eastern District of Virginia and elsewhere, defendants JOHNSON, WAKEFORD, WIEGAND and TULI unlawfully, willfully and knowingly, directly and indirectly, (a) made and caused to be made materially false and misleading statements and (b) omitted to state, and caused others to omit to state, material facts necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading to the outside auditors of PurchasePro, an issuer of a class of securities registered pursuant to Section 12 of the Securities Exchange Act of 1934, in connection with examination and review of the financial statements of PurchasePro as required by law to be made, and preparation and filing of a document and report required to be filed with the SEC pursuant to the rules and regulations enacted by the SEC.

3.      Specifically, JOHNSON, WAKEFORD, WIEGAND and TULI confirmed and caused others to confirm on a conference call with PurchasePro's outside auditors that the auction integration work was completed by the close of the first quarter of 2001, ending March 31, 2001, and that no integration work was required after the first quarter, when, in fact, they knew that full integration was not completed and that work continued into the second quarter.

(All in violation of Title 15, United States Code, Sections 78ff, 78m(a) and 78m(b); Title 17, Code of Federal Regulations, Section 240.13b2-2; and Title 18, United States Code, Section 2.)

## COUNTS SIX THROUGH TWENTY-FIVE

(Wire Fraud and Aiding and Abetting – JOHNSON, WAKEFORD, TULI and BENYO)

THE GRAND JURY FURTHER CHARGES THAT:

1.     The allegations contained in paragraphs one through forty-one of the Introductory Allegations and paragraphs three through one hundred thirty-eight of Count One of this Indictment are repeated and realleged as if fully set forth herein.

2.     On or about the respective dates shown below in Counts six through twenty-five, within the Eastern District of Virginia and elsewhere, defendants JOHNSON, WAKEFORD, TULI, BENYO and others, for the purpose of executing the scheme and artifice to defraud described above, to deprive PurchasePro and AOL of its intangible right of honest services, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, did knowingly transmit, and cause others to transmit, by wire communications in interstate commerce certain writings, signs, signals, pictures and sounds, as described below:

| Count | Date | Defendant | State of Origin | State of Receipt | Communication |
|-------|------|-----------|-----------------|------------------|---------------|
| 6 | 3/17/2001 | Wakeford | New York | New York | E-Mail |
| 7 | 3/29/2001 | Johnson Wakeford | New York | New York | E-Mail |
| 8 | 3/29/2001 | Wakeford | New York | New York | E-Mail |
| 9 | 3/30/2001 | Wakeford | New York | Nevada | E-Mail |
| 10 | 3/30/2001 | Benyo Wakeford | Virginia | New York Nevada Florida | Telephone |
| 11 | 3/31/2001 | Tuli | Virginia | Nevada | E-Mail |
| 12 | 3/31/2001 | Tuli Wakeford | Virginia | New York | E-Mail |
| 13 | 3/31/2001 | Wakeford | New York | New York | Instant Messaging |
| 14 | 3/31/2001 | Johnson Wakeford | New York | New York | E-Mail |
| 15 | 4/1/2001 | Johnson | New York | Virginia | E-Mail |

37

| Count | Date | Defendant | State of Origin | State of Receipt | Communication |
|-------|------|-----------|-----------------|------------------|---------------|
| 16 | 4/1/2001 | Wakeford | New York | Texas | E-Mail |
| 17 | 4/2/2001 | Johnson Wakeford | New York | New York | E-Mail |
| 18 | 4/2/2001 | Johnson Wakeford | New York | New York | E-Mail |
| 19 | 4/2/2001 | Wakeford | New York | New York | E-Mail |
| 20 | 4/3/2001 | Wakeford | New York | Virginia | E-Mail |
| 21 | 4/4/2001 | Wakeford | New York | Massachusetts | E-Mail |
| 22 | 4/4/2001 | Johnson | New York | Virginia | E-Mail |
| 23 | 4 /19/2001 | Tuli Wakeford | Virginia | New York | E-Mail |
| 24 | 4/20/2001 | Tuli Benyo | Nevada | Virginia | E-Mail |
| 25 | 4/24/2001 | Tuli Wakeford | Nevada | Virginia New York | E-Mail |

With the exception of count 10, the wire transmissions described above were e-mails, instant messages and other forms of wire transmissions that entered and exited the Eastern District of Virginia and were transmitted from and to another state by means of an AOL server located in the Eastern District of Virginia.

(All in violation of Title 18, United States Code, Sections 1343, 1346 and 2.)

## COUNTS TWENTY-SIX THROUGH TWENTY-SEVEN

(Wire Fraud – JOHNSON and WAKEFORD)

THE GRAND JURY FURTHER CHARGES THAT:

1.    The allegations contained in paragraphs one through forty-one of the Introductory Allegations and paragraphs three through one hundred thirty-eight of Count One of this Indictment are repeated and realleged as if fully set forth herein.

2.    On or about the respective dates shown below in Counts twenty-six through twenty-seven, within the Eastern District of Virginia and elsewhere, defendants JOHNSON, WAKEFORD and others, for the purpose of executing the scheme and artifice described above, and to deprive PurchasePro and AOL of its intangible right to honest services, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, did knowingly transmit, and cause others to transmit, by wire communications in interstate commerce certain writings, signs, signals, pictures and sounds, as described below:

| Count | Date | Defendant | State of Origin | State of Receipt | Communication |
|-------|------|-----------|-----------------|------------------|---------------|
| 26 | 3/30/2001 | Johnson | New York | Virginia | Facsimile |
| 27 | 4/1/2001 | Wakeford | New York | Virginia | Facsimile |

(All in violation of Title 18, United States Code, Sections 1343, 1346 and 2.)

39

## COUNT TWENTY-EIGHT

(Obstruction of Justice - JOHNSON)

THE GRAND JURY FURTHER CHARGES THAT:

1.      In or about April 2001 through December 2003, within the Eastern District of Virginia and elsewhere, the defendant, CHARLES E. JOHNSON, JR., did corruptly persuade and attempt to persuade, and engaged and attempted to engage in misleading conduct toward another person, to influence the testimony of another person in an official proceeding, to wit, the investigation of a federal Grand Jury in the Eastern District of Virginia.

2.      In May 2001, the Division of Enforcement of the United States Securities and Exchange Commission ("SEC") opened an investigation concerning PurchasePro. The SEC investigated possible violations of the anti-fraud, books and records, internal accounting controls, insider trading, lying to auditors and disclosure provisions of the federal securities laws. The investigation encompassed, among other things, the relationship between PurchasePro, AOL, and other third party customers, as well as the conduct of certain officers, directors, executives, and senior-level employees within PurchasePro and AOL regarding their participation in a scheme to falsely, fraudulently and materially inflate PurchasePro's revenues. Pursuant to this investigation, the SEC staff (i) issued subpoenas requiring the production of documents; (ii) conducted witness interviews; and (iii) took the sworn testimony of numerous witnesses.

3.      In or about January and February 2002, JOHNSON discussed the SEC's investigation with certain of his co-conspirators from PurchasePro. JOHNSON instructed his co-conspirators to lie under oath during their sworn testimony before the SEC. JOHNSON coached these co-conspirators about the false story they all agreed to tell the SEC about their activities at PurchasePro.

4.      In or about February 2002, these co-conspirators in fact did lie under oath during sworn testimony before the SEC about one or more subjects material to the SEC's investigation.

40

5.    On or about July 26, 2002, the Federal Bureau of Investigation ("FBI") commenced a criminal investigation of matters relating to AOL's relationship with its partners, including PurchasePro, involving potential violations of federal criminal laws.  The FBI's investigation included an examination of PurchasePro's reported revenues in 2000 and 2001, the sales of marketplace licenses and use of secret side deals and efforts to destroy documents and obstruct investigations.

6.    On or about February 7, 2003, a federal Grand Jury in the Eastern District of Virginia issued a subpoena relating to the criminal investigation into PurchasePro and its relationship with AOL.

7.    In or about the fall of 2003, after former PurchasePro officers Jeffrey R. Anderson and Scott H. Miller entered guilty pleas to felonies in the Eastern District of Virginia relating to the fraud at PurchasePro, JOHNSON discussed the guilty pleas with his co-conspirators and repeated his instructions to lie about what happened at PurchasePro in the event any of them were asked about it by the FBI.

8.    On or about December 12, 2003, at least one of the co-conspirators coached by JOHNSON did lie to the FBI about one or more subjects material to the FBI's investigation in an interview conducted in Alexandria, Virginia in the Eastern District of Virginia,.

(All in violation of Title 18, United States Code, Sections 1512(b) and 3551 *et seq.*)

41

## COUNT TWENTY-NINE

### (False Statements –WIEGAND)

THE GRAND JURY FURTHER CHARGES THAT:

1.      On or about July 26, 2002, the Federal Bureau of Investigation ("FBI")
commenced a criminal investigation of matters relating to AOL's relationship with its partners,
including PurchasePro, involving potential violations of federal criminal laws.  The FBI
investigation included an examination of PurchasePro's reported revenues in 2000 and 2001, the
sales of marketplace licenses and use of secret side deals, and efforts to destroy documents and
obstruct investigations.

2.      On or about November 25, 2003, in the Eastern District of Virginia, in a matter
within the jurisdiction of the Federal Bureau of Investigation, a branch of the United States
Department of Justice an agency of the executive branch of the United States, the defendant,
SCOTT E. WIEGAND, knowingly and willfully made a materially false, fictitious and
fraudulent statement and representation, in that WIEGAND falsely stated in an interview with
the FBI that WIEGAND had told PurchasePro's auditors in or about April 2001 that AOL was
strong-arming its customers and reworking IMAs with those customers in conjunction with the
customers' purchase of PurchasePro products, when in fact, as he well knew, WIEGAND did not
tell PurchasePro's auditors that AOL was strong-arming its customers and reworking IMAs with
those customers in conjunction with the customers' purchase of PurchasePro products.

(All in violation of Title 18, United States Code, Section 1001(a)(2) and 3551 *et seq.*)

42

## COUNT THIRTY

(False Statements –WIEGAND)

THE GRAND JURY FURTHER CHARGES THAT:

1.     On or about July 26, 2002, the Federal Bureau of Investigation ("FBI") commenced a criminal investigation of matters relating to AOL's relationship with its partners, including PurchasePro, involving potential violations of federal criminal laws. The FBI investigation included an examination of PurchasePro's reported revenues in 2000 and 2001, the sales of marketplace licenses and use of secret side deals, and efforts to destroy documents and obstruct investigations.

2.     On or about November 25, 2003, in the Eastern District of Virginia, in a matter within the jurisdiction of the Federal Bureau of Investigation, a branch of the United States Department of Justice, an agency of the executive branch of the United States, the defendant, SCOTT E. WIEGAND, knowingly and willfully made a materially false, fictitious and fraudulent statement and representation, in that WIEGAND falsely stated in an interview with the FBI that WIEGAND did not ask anyone within PurchasePro to delete WIEGAND's e-mails, when in fact, as he well knew, WIEGAND did ask a member of PurchasePro's technology department to delete his e-mails.

(All in violation of Title 18, United States Code, Section 1001(a)(2) and 3551 *et seq.*)

## COUNT THIRTY-ONE

(False Statements –KENNEDY)

THE GRAND JURY FURTHER CHARGES THAT:

1.      On or about July 26, 2002, the Federal Bureau of Investigation ("FBI") commenced a criminal investigation of matters relating to AOL's relationship with its partners, including PurchasePro, involving potential violations of federal criminal laws.  The FBI investigation included an examination of PurchasePro's reported revenues in 2000 and 2001, the sales of marketplace licenses and use of secret side deals, and efforts to destroy documents and obstruct investigations.

2.      On or about June 11, 2003, in the Eastern District of Virginia, in a matter within the jurisdiction of the Federal Bureau of Investigation, a branch of the United States Department of Justice an agency of the executive branch of the United States, the defendant, JOSEPH MICHAEL KENNEDY, knowingly and willfully made a materially false, fictitious and fraudulent statement and representation, in that KENNEDY stated in an interview with the FBI that KENNEDY had signed the AuctioNet Statement of Work in the last few days of March 2001 during the first quarter of 2001, when in fact, as he well knew, KENNEDY did not sign the Statement of Work until after the first week of April 2001 after the close of the first quarter of 2001.

(All in violation of Title 18, United States Code, Section 1001(a)(2) and 3551 *et seq.*)

44

## FORFEITURE

1.        If convicted of the conspiracy charged in Count One of this Indictment,
defendants shall forfeit to the United States, pursuant to Title 18, United States Code, Section
981(a)(1)(C) and Title 28, United States Code, Section 2461, any property, real or personal,
which constitutes or is derived from proceeds traceable to wire fraud, in violation of Title 18,
United States Code, Section 1343, and securities fraud, in violation of Title 15, United States
Code, Section 78ff, including a sum of money equal to at least $2,300,000.00 in United States
currency, representing the amount of proceeds obtained as a result of the conspiracy charged in
Count One, for which the defendants are jointly and severally liable.

2.        Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title
28, United States Code, Section 2461(c), each defendant shall forfeit substitute property, up to
the value of the amount described, i.e., $2,300,000.00 in United States currency, if, by any act or
omission of the defendant, the $2,300,000.00 in United States currency or any portion thereof,
cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited
with a third party; has been placed beyond the jurisdiction of the Court; has been substantially
diminished in value; or has been commingled with other property which cannot be divided
without difficulty.  The property subject to forfeiture as substitute assets includes, but is not
limited to, the following:

3.        With respect to defendant CHARLES E. JOHNSON, JR., the following property:

   a.        a sum of money equal to the amount of proceeds obtained as a result of the
   conspiracy, securities fraud and wire fraud offenses, for which the defendants are
   jointly and severally liable;

   b.        real property known as 8801 Palm Greens Ct., Las Vegas, NV 89134.

4.        With respect to defendant KENT D. WAKEFORD, the following property:

   a.        a sum of money equal to the amount of proceeds obtained as a result of the
   conspiracy, securities fraud and wire fraud offenses, for which the defendants are
   jointly and severally liable;

45

b.    all funds contained in AOL Time Warner IRA Savings Plan maintained at Fidelity, account number 207-298000;

c.    all funds contained in E*Trade Securities LLC account number 1095-4310;

d.    all funds contained in Citibank account number 80452276.

5.    With respect to defendant SCOTT E. WIEGAND, the following property:

a.    a sum of money equal to the amount of proceeds obtained as a result of the conspiracy, securities fraud and wire fraud offenses, for which the defendants are jointly and severally liable;

b.    real property known as 912 Cypress Ridge Lane, Las Vegas, Nevada, 89144;

c.    all funds contained in Vanguard account number 09959204783.

6.    With respect to defendant JOHN P. TULI, the following property:

a.    a sum of money equal to the amount of proceeds obtained as a result of the conspiracy, securities fraud and wire fraud offenses, for which the defendants are jointly and severally liable;

b.    all funds contained in State Street Bank account number 52020777;

c.    all funds contained in State Street Bank account number 52020776;

7.    With respect to defendant JOSEPH MICHAEL KENNEDY, the following property:

a.    a sum of money equal to the amount of proceeds obtained as a result of the conspiracy, securities fraud and wire fraud offenses, for which the defendants are jointly and severally liable;

b.    all funds contained in Merrill Lynch account number 74796457;

c.    all funds contained in Bank of America account number 0049-6137-8699;

d.    all funds contained in Fidelity MML Investors Services Inc. account number BMA531260.

46

8.    With respect to defendant CHRISTOPHER J. BENYO, the following property:

a.    a sum of money equal to the amount of proceeds obtained as a result of the conspiracy, securities fraud and wire fraud offenses, for which the defendants are jointly and severally liable;

b.    real property known as 8 Rubaiyat Ct., Greer, South Carolina 29650;

c.    all funds, contained in Sanford C. Bernstein Co. LLC account number 03751722;

d.    all funds contained in Sanford C. Bernstein Co. LLC account number 03751723;

e.    a 2001 Porsche Boxster bearing VIN WPOCB29841U664470.

(Pursuant to 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461, and 21 U.S.C. § 853.)

## SENTENCING FACTORS

1.    With respect to each count of the Indictment with which each defendant is charged:

        a.    the loss exceeded $20 million;

        b.    the offense involved more than minimal planning;

        c.    the offense involved a scheme to defraud more than one victim;

        d.    the offense was committed through mass-marketing; and

        e.    the offense involved sophisticated means.

2.    With respect to each count of the Indictment with which each defendant is charged:

        a.    JOHNSON was an organizer and leader of a criminal activity that involved five and more participants and was otherwise extensive;

        b.    WAKEFORD, TULI, BENYO, KENNEDY and WIEGAND were each a manager and supervisor and the criminal activity involved five and more participants and was otherwise extensive;

        c.    JOHNSON, WAKEFORD, TULI, BENYO, KENNEDY and WIEGAND each abused a position of public and private trust and used a special skill in a manner that significantly facilitated the commission and concealment of the offenses; and

        d.    JOHNSON, WAKEFORD, TULI, KENNEDY and WIEGAND willfully obstructed and impeded, and attempted to obstruct and impede, the administration of justice during the course of the investigation and prosecution of the instant offense and the obstructive conduct related to the defendant's offense and any relevant conduct and a closely related offense.

48

A TRUE BILL

_____
Foreperson
Alexandria, Virginia

Date: _____

PAUL J. MCNULTY
United States Attorney

By: Jack Hanly
    Assistant United States Attorney
    Supervisor, Fraud Section

Dana J. Boente
Charles F. Connolly
Assistant United States Attorneys

Adam A. Reeves
Trial Attorney, Fraud Section
U.S. Department of Justice, Criminal Division

49

No.

# UNITED STATES DISTRICT COURT

*Eastern District of Virginia*

*Alexandria Division*

THE UNITED STATES OF AMERICA

vs.

Christopher J. Benyo
Charles E. Johnson, Jr.
Joseph Michael Kennedy
John P. Tuli
Kent D. Wakeford
Scott E. Wiegand

## INDICTMENT

Counts 1: 18 U.S.C. § 371 (Conspiracy)
Counts 2-3: 15 U.S.C. § 78j(b) and 78ff; 17 C.F.R., § 240.10b-5
(Securities Fraud)
Count 4-5: 15 U.S.C. § 78m(b)(1) and 78ff; 17 C.F.R. § 240.13b2-2
(False Statements to Auditors)
Counts 6-27: 18 U.S.C. § 1343 and 1346 (Wire Fraud)
Count 28: 18 U.S.C. § 1512 (Obstruction)
Count 29-31: 18 U.S.C. § 1001 (False Statements)
Forfeiture Notice 18 U.S.C. § 981
Sentencing Factors 18 U.S.C. §§ 3551 et seq.

*A true bill.*

_____
Foreperson

*Filed in open court this* _____ *day, of* _____ *A.D. 20.*

_____
Clerk

*Bail, $* _____

APR 91